(116 So. 379)

No. 28862.

## SMITH et al. v. SUN OIL CO., Inc.

Jan. 18, 1928. Rehearing Denied Feb. 13, 1928.

*(Syllabus by Editorial Staff.)*

1. **Mines and minerals** ☞74—**Contract whereby lessee granted interest less than own held sublease, and not assignment, preventing forfeiture for nonproduction (Civ. Code, art. 2725).**

A contract whereby a lessee of an oil and gas lease disposed of certain of his rights and obligations as to 20 acres of the land, but granted an interest less than his own, *held* a sublease, and not an assignment, preventing forfeiture, where the portion subleased was producing, though the other portion was not, in view of Civ. Code, art. 2725, which recognizes the distinction between a sublease and an assignment.

2. **Mines and minerals** ☞73½—**Lease, divisible by assignment, which was not to terminate while land produced minerals, held not terminated as to portion not subleased, where subleased portion produced oil; "sublease" not being "assignment."**

A lease which provided that it was divisible into two or more leases by assignment of a portion, and which was not to terminate while oil, gas, or minerals were produced therefrom, *held* not divided by a sublease, and hence not to terminate as to the portion not subleased, which was nonproducing, where the subleased portion was producing oil, since "sublease" was not equivalent to an "assignment."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Assignment; Second Series, Sublease.]

Appeal from Twenty-Sixth Judicial District Court, Parish of Bossier; Harmon C. Drew, Judge.

Suit by Gilliam W. Smith and others against the Sun Oil Company, Inc. Judg-ment for plaintiffs, and defendant appeals. Judgment annulled, and suit dismissed.

Albert P. Garland and Wise, Randolph, Rendall & Freyer, all of Shreveport, for appellant.

Blanchard, Goldstein & Walker, of Shreveport, for appellees.

O'NIELL, C. J. The defendant has appealed from a judgment declaring an oil and gas lease forfeited, and ordering it canceled, as to 180 acres of the 200 acres of land leased, and condemning the defendant to pay the plaintiffs $500 as attorney's fees.

On the 21st of January, 1920, G. W. Smith, who was and is yet the owner of the land (and from whom the other plaintiffs in this suit afterwards acquired certain interests in the mineral rights), leased to the defendant Sun Oil Company, Inc. (then called the Sun Company), for the production of oil and gas and other minerals, the 200 acres of land described as the S. E. ¼ of N. E. ¼ and N. E. ¼ of S. E. ¼ of section 22, the S. W. ¼ of N. W. ¼ of section 23, and the N. ½ of N. W. ¼ of section 26, in township 19 N., range 11 W. On the 1st of November, 1922, the lessee subleased to E. A. Elliott the 20 acres described as the W. ½ of N. W. ¼ of N. W. ¼ of section 26; and, on the 28th of the same month, Elliott assigned his sublease to R. L. Autrey, who drilled five wells on the 20 acres. Four of the wells were producers from the early part of 1923 until the latter part of August or first of September, 1926. The wells produced 22,361 barrels of oil, worth $1.50 to $2 per barrel, the quantity produced in 1926 being 2,094 barrels.

W. H. Olmstead, for the Sun Oil Company, drilled a well on the N. E. ¼ of S. E. ¼ of section 22 (being a part of the remaining 180 acres), in April and May, 1925, but he found salt water at a depth of 390 feet, and abandoned the well. In March and April, 1926, after this suit was filed and notice of lis

pendens was recorded—but without actual knowledge of the suit—George W. Wethersby, having a sublease on the S. W. ¼ of N. W. ¼ of section 23 from the Sun Oil Company, drilled a gas well on the southeast corner of that tract. The well had an estimated capacity of 1,000,000 feet of gas, worth approximately $25 per day, for fuel needed for operations in the Belleview field; but it appears that Wethersby learned of this suit when he was about to complete his well, and, because of the litigation, no gas was ever marketed from the well. There is therefore considerable doubt about the estimated capacity of the well, and as to whether it should have been regarded as a producing well, in determining whether the lease was kept in force by the production of oil or gas.

[1, 2] The term of the original lease from Smith to the Sun Company, now the Sun Oil Company, Inc., was expressed thus:

"For the term of three (3) years from this date (the 21st of January, 1920), and so long thereafter as oil, gas or any other mineral is produced therefrom, or royalties paid hereunder, or as long thereafter as lessee, in good faith, shall conduct drilling or mining operations thereon, with the right, if such operations result in production, to continue this lease as long as oil, gas or other mineral shall be produced."

The defendant, before answering the suit, filed a plea of prematurity and an exception of no cause or right of action, because of a saving clause in the ninth paragraph of the original lease, viz.:

"After the discovery of oil, gas or any other mineral in paying quantities on the premises, this lease shall not be subject to loss or forfeiture, in whole or in part, except after final judicial ascertainment of grounds sufficient to warrant forfeiture and after a reasonable opportunity has been afforded lessee to save the lease after such judicial ascertainment."

Plaintiffs' counsel argue that that clause in the lease is not an appropriate defense in a suit such as this, to cancel the lease on the ground that its term has expired. We are not so sure that the clause quoted would not compel us to grant the defendant a reasonable opportunity to save the lease from forfeiture, before we could finally declare it forfeited, if we should find sufficient grounds to warrant a forfeiture. The conclusion which we have come to, however, with regard to another issue in the case, avoids the necessity for deciding whether the defendant is entitled to a further opportunity to save the lease before it can, in this suit, be declared finally forfeited. This saving clause in the lease, according to its terms, became effective "after the discovery of oil, gas or other mineral in paying quantities on the premises." Oil was found in paying quantities on the 20 acres described as the W. ½ of N. W. ¼ of N. W. ¼ of section 26, by R. L. Autrey, in the early part of 1923; and he paid the one-eighth royalty due to the landowner under the original lease to the Sun Company; and paid also the overriding royalty of one-eighth to the Sun Oil Company, Inc., as required in the sublease, from the early part of 1923 until the latter part of August or first of September, 1926. As the suit was filed on the 25th of January, 1926, Autrey was paying royalties on the oil that he was producing when the suit was filed, and he continued to pay the royalties for seven months after the suit was filed. That is why the plaintiffs sued only for a forfeiture of the lease on the remaining 180 acres of land, and not on the 20 acres subleased to Elliott and assigned to Autrey. The suit is founded upon the contention, on the part of the plaintiffs, that Elliott acquired not a sublease but an assignment of the original lease as far as it affected the 20 acres of land described as the W. ½ of N. W. ¼ of N. W. ¼ of section 26, and therefore that the production of oil by Autrey on the 20 acres of land did not keep the lease in force on the remaining 180 acres retained under the lease by the Sun Oil Com-

pany;· for the original lease contains a stipulation permitting a partial assignment, viz.:

"All covenants and agreements herein between the parties shall extend to and be binding upon their heirs, executors, administrators, successors and assigns; and this lease may be assigned, in whole or in part, either as to any interest therein or any portion of the premises; in which last event, lessee shall be liable only for the royalties accruing from the acreage retained by him, and, in the exercise of his option to extend this lease, shall have the privilege of paying such proportion of the rentals under this lease as the acreage retained bears to the entire acreage covered by this lease, and the assignee of the lessee shall have corresponding rights and privileges with respect to said royalties and rentals as·to the acreage so assigned."

The paragraph which we have quoted gave the original lessee the ·right to divide the lease into two or more leases, by assigning the lease on any part or parts of the 200 acres of land; and, if the assignment to Elliott was in fact and in law an assignment only, and not a sublease, the production of oil by Autrey, on the 20 acres of land, and the payment of royalties thereon, did not keep the original lease in force on the 180 acres retained under lease by the Sun Oil Company. Our opinion, however, is that the so-called assignment made by the Sun Company to Elliott was in fact and in law a sublease, and not merely an assignment, and, therefore, that the operations carried on by Autrey on the 20 acres subleased to Elliott inured to the benefit of the sublessor, and kept the lease in force on the whole 200 acres of land. The fact that the Sun Company, as sublessor, and Elliott, as sublessee, in their contract, used the words, "grant, convey, transfer and assign," did not, of itself, make the contract an assignment merely, or deprive it of the character of a sublease; for there were several stipulations in the contract which made it, essentially, a sublease, and not merely an assignment. Every sublease is, in a sense,· an assignment, but every assignment of a lease is not a sublease.

The conditions of and in the contract between the Sun Company and Elliott which made it a sublease, and not merely an assignment, were that the Sun Company did not dispose of all of its rights and obligations under the original lease on the 20 acres of land, but granted to Elliott an interest less than its own, and imposed upon him obligations under penalty of reversion to the Sun Company, in addition to the obligations which Elliott assumed in favor of the original lessor. The very purpose of the sublease was to obtain immediate development and production on the leased premises in order to prevent a forfeiture of the original lease. It was stipulated, therefore, in the sublease to Elliott, that he should commence the drilling of an additional well on the 20 acres within 30 days, and should drill and complete all other wells necessary to protect the lines, and that a failure on the part of Elliott in that respect would forfeit all of his rights, and cause them to revert to and revest in the Sun Company. It was stipulated that Elliott should pay an additional one-eighth royalty to the Sun Company, besides paying the one-eighth royalty due to the original lessor; and it was stipulated that all of Elliott's rights as lessee should revert to and revest in the Sun Company whenever Elliott should cease operations, and that all of the drilling material turned over to him should also revert to the Sun Company.

In Bouv. Law Dict., p. 3351, a sublease, or an underlease, is defined as:

"An alienation by· a tenant of a part of his lease, reserving to himself a reversion; it differs from an assignment, which is a transfer of all the tenant's interest in the ·lease. W. Bla. 766. And even a conveyance of the whole estate by the lessee, reserving to himself the rent, with a power of re-entry for nonpayment, was held to be not an assignment but an underlease." ·

In Taylor's work on Landlord and Tenant (9th Ed.) § 16, the author points out the same

distinction between an assignment and a sublease, and says:

"And the importance of this distinction consists in this, that, while an assignee is liable to the original lessor for all the obligations of the lessee by virtue of the privity of estate that subsists between them, no action can be maintained by the lessor against the undertenant, upon any covenant contained in the lease, since there is neither privity of estate nor of contract between himself and the undertenant. (The effect of a demise by the lessee of his whole term is, therefore, to divest him of his reversionary rights, and render his lessee liable as assignee to the lessor.)"

In section 426, the author says:

"An assignment differs from a lease in that, by the latter, the lessor grants an interest less than his own, reserving to himself a reversion; but by an assignment he parts with the whole of his interest in the estate. * * * But it is held that if by the terms of the conveyance, be it in the form of a lease or an assignment, new conditions with a right of entry, or new causes of forfeiture, are created, then the tenant holds by a different tenure, and a new leasehold arises, which cannot be treated as an assignment or a continuation to him of the original term."

In Robinson et al. v. Freret, Sheriff, et al., 9 La. Ann. 303, the following contract was held to constitute a sublease: J. B. Oliver, as agent for the landowner, leased to the firm of Robinson, Hyde & Mackie certain lots of ground on the river front, for six years, with the right of the lessees to renew the lease for four years longer, at $2,000 per annum; and the Pelican Dry Dock Company intervened in the contract, in which it was stipulated that the company's floating dry dock should be located in front of the leased premises, and that the company should have the right to so use the premises for its operations during the term of the lease and the renewal, if renewed, on condition that the company should contribute half of the rent stipulated in the lease, and be bound as surety for the payment of half of the rent by the lessees. The dry dock company was held to be, not only the surety for half of the rent

due by Robinson, Hyde & Mackie to the landowner, but the sublessee of that part of the premises used by and for the dry dock.

In Audubon Hotel Co. v. Braunnig, 120 La. 1089, 46 So. 33, 124 Am. St. Rep. 456, it was held:

"A lease from lessor to lessee does not pass to the subtenant. There is no contractual tie between the lessor and the subtenant.

"The recourse of the subtenant is against his immediate lessor. The duty of the latter is to protect his subtenant and compel his lessor to perform his part of his obligation as a lessor, which is to inure to the subtenant under the terms of the lease."

The Civil Code, in article 2725, recognizes the distinction between a sublease and an assignment of a lease, for it provides that a lessee has the right to sublease, *or even to cede his lease*, to another person, unless the right is expressly prohibited, and that the prohibition may be for the whole or for only a part of the lease, and that a clause prohibiting a sublease or an assignment of the lease is always construed strictly. The French text of article 2725, in article 2696 of the Code of 1825, is an exact copy of article 1717 of the French Code, except that the last clause in article 2696 of the Louisiana Code, "Et cette clause est toujours de rigueur," is in a separate paragraph in article 1717 of the French Code.

The learned counsel for appellant have furnished a translation of some of the most interesting discussions by the French commentators on article 1717 of the French Code.

Baudry-Lacantinerie, vol. 20, p. 616, says:

"1052. 'The lessee,' says article 1717, C. Civ., 'has the right to underlease, or even to cede his lease to another person, unless that power has been expressly interdicted. The interdiction may be for the whole, or for a part. This clause is always construed strictly.'

"To underlease is to give by lease that which is held by the same title, or, in other terms, to let by subcontract, for the whole or for part, to another person. The name of sublessor is given

to him who subleases, and that of sublessee to him in whose favor the sublease is made. There are then two leases superposed; the sublessor is a party to both at the same time—lessee in the first, he becomes lessor in the second.

"To cede his lease is to transmit to another, by title of assignment, the right resulting from a contract of lease in which one figures by the title of lessee. The assignment of lease is a transfer of the right of enjoyment resulting from a lease. It follows, on the one part, that the assignee acquires a direct action against the lessor, and, on the other part, that he will be bound with respect to third persons only by the accomplishment of one of the two formalities prescribed by article 1690; otherwise, the assignment of lease, as the sublease, may be for the whole or for part.

"Such is the technical sense of the expressions 'sublease,' and 'to cede his lease.' The sublease is one lease ingrafted on another; the assignment of lease, a transfer, a sale of the right of enjoyment resulting from a lease. This last operation appears to us more radical than the first, and it is without doubt the idea intended to be expressed by article 1717 when it says that 'the lessee has the right to sublease, and even to cede his lease.'

"In practice, the expression 'to cede his lease' is generally used to denote a sublease referring to the totality of the thing leased; and it often happens that the parties, having intended to make a sublease of the whole, have designated the operation by the name of assignment of lease. Since it is always necessary to take into consideration the intention of the parties, in such cases the rules of sublease and not those of assignment should be applied. But by what sign may the true intention of the parties be recognized? In our opinion, the manner in which the price has been fixed furnishes the most decisive element in this matter. There could scarcely be any doubt but that the parties had intended to make a true assignment of the lease, if the price had been fixed at a lump sum of —— for all the time yet to run until the expiration of the lease, even if several successive terms may have been accorded to the assignee for payment. On the contrary, the parties would nearly always have intended to make a sublease, even if they had spoken of assignment of lease, if the price had been fixed at so much a year, a semester, a trimester, a month or a day, particularly if the periods of payment are the same as those of the transferred lease.

"In case of doubt, the expression employed should always be consulted; thus the word 'assignment' of lease, if it is not interpreted by another clause, indicates that there was actually an assignment.

"The opinion that in our law the assignment of a lease is a sublease of the entire immovable, and which reserves the name and effects of sublease to the sublease of a part (of the immovable), ought to be rejected.

"In default of any expression or clause indicating the will of the parties, to sublease should be presumed; that was formerly the most usual method of transfer, since the old authors did not concern themselves with assignment; even to-day it ought to be presumed that the parties have intended to create between them the rights and obligations of lessor and lessee.

"No. 1053. The question of knowing if in any determined hypothesis, there has been a sublease or assignment of lease, is of great importance because there are considerable differences between the two operations; these are all derived from this premise, that the sublease is a lease and the assignment of lease a sale.

"1. The proof of assignment is easier than that of sublease.

"2. The sublease creates in favor of the sublessor a privilege on the movables of the sublessee in the leased house or farm. This privilege does not exist in favor of him who has assigned his lease.

"3. The sublease may invoke with respect to sublessors article 1720, and demand that the thing leased be delivered to him in good state of repair. The assignee of a lease has not the same right. As a purchaser he may only claim the thing in the state in which it is found at the moment of the assignment. Article 1614.

"4. The subtenant may demand of the sublessor indemnity when more than one-half of the harvest which the leased premises have formerly produced is destroyed by fortuitous event. The assignee of a lease has not the same right. He has that right only against the lessor and in the case where the assignor would have had that right himself.

"5. The assignment of a lease transmits to the assignee the right of enjoyment which the assignor had against the lessor; the assignee may then act directly against the lessor; it is otherwise in the case of a sublease. However, as we shall see this difference is disputed.

"6. The assignee of the lease, as all assignors, conformable to article 1690, ought to notify the assignment to the lessor; it is otherwise with the sublessee.

"7. The assignee ought to abide by the clause in the lease in derogation of common law just as he may claim the benefit of such clauses; it is otherwise with the sublessee."

Moulon, vol. 3, p. 306, says:

"There exists another interpretation of the words 'sublease' and 'assignment' of lease.

"To sublease is to lease in whole or in part the thing of which one is the lessee; to cede his lease is to sell, to cede in whole or in part the rights which one has as a lessor, together with the charges with which those rights are burdened.

"The sublease is a new lease; the assignment of a lease is an assignment."

Beudant, p. 374, says:

"531. The sublease is a lease in which the lessee, called a 'principal lessee' enjoys the role of lessor. There are two leases superposed: One between the lessor and the first lessee; the other between the first lessee and the new lessee. It is one of the cases where it is inexact to give to the lessor the qualification of owner as is done in article 1716. The relationship between the principal lessee and the sublessee is regulated by the rules of lease from which result the following consequences:

"1. The clauses of the two leases may be different, notably the rent of the second lease may be more or less than the rent of the first.

"2. The principal lessee, become lessor, enjoys on the movable of the lessee the privileges established by article 2102–1. The sublessee may invoke article 1720 against the principal lessee, but he does not have this right against the lessor. Nevertheless, even though the second lease be a new lease, it creates relationship between the first lessor and the sublessee:

"(1) The first lessor may, within the limits of the price of his lease, pursue the sublessee. He may pursue him first through the action of article 1166 within the limits that the sublessee owes to the principal lessee. He may, moreover, pursue him by direct action. Article 820, Code of Procedure, and 1753, Civil Code.

"(2) The primitive lessor may invoke against the sublessee the responsibility of articles 1733 and 1734.

"532. The assignment of lease consists in the transmission of rights resulting from the lease, in the transmission of that which one commonly calls the right to the lease, otherwise called the rights and obligations which a lease confers and imposes on the lessee. There is no new lease; it is a former lease which is ceded from an active and passive point of view; one transfers the right to the lease in substituting a new lease for the former.

"Thus, the mutual obligations between the ceding lessee and the assignee are not regulated by the rules of lease but by those of assign-ment, such as are established by article 1689 et seq.

"The consequences are easy to deduce:

"1. The sublessee does not owe any notification to the lessor, but it is otherwise with the assignee.

"2. The first lessee does not owe the assignee the right of enjoyment, but only owes him the guaranty of the existence of the lease.

"3. The assignor has not for the security of the price of the assignment the privilege of article 2102–1. In fact, he is not a lessor, but a vendor.

"4. The assignee may not invoke against the assignor the benefit of article 1720. He takes the thing in the state that it is at the time of the assignment.

"5. The assignee has a direct action against the lessor to obtain the accomplishment of the obligations for which he is bound, and reciprocally.

"In a word the lease which may be invoked by or against the lessee may now be so invoked by or against the assignee."

Marcade, vol. 6, p. 112, says:

"The right of enjoyment conferred by a lease is not exclusively the right of the lessee. It is transmissible to his heirs; it is seizable by his creditors who may seize it for their profit, if they find it of advantage to do so, and it may be ceded by the lessee to a third person either for all or for a part.

"This transmission of the right by the lessee to a third person may be effected in two manners: It may be effected by a total or partial assignment of the lease itself, or by a simple sublease, equally total or partial. By means of the assignment, properly speaking, the third person is placed absolutely in the place of the assigning lessee. He acquires neither more nor less than the rights which that one had and the title of the one becomes the title of the other; so that, if a particular clause of the lease extended or restrained the ordinary rights of all lessees, the second lessee will enjoy that extension or be subject to the restriction. In the sublease, on the contrary, the third person does not become the lessee of the owner, but the lessee of the lessee; his rights are with respect to that one (in default of contrary stipulation expressed or tacit) those which the law gives to all lessees, so that he is not held to submit on his part to the restrictions on the common law which the lessee had accepted; nor may he invoke the extensions which the lessee had been able to stipulate with the owner.

"If, for example, it is a question of rural property and the half of a harvest be destroyed

by fortuitous circumstances, the sublease of all or a part of the farm (if there has been no stipulation on this subject) would give to the sublessee the right of demanding a diminution of the price (article 1769), even if the lessee in his contract with the lessor had renounced this right; while an assignment of the lease in the same case placing the second lessee exactly in the place of the first lessee would prevent all reclamation on his part. Reciprocally, if in the lease of a private house wherein the lessee has stipulated the right to change the destination of the premises and to make of it, if he wishes, a shop or store, the third person with whom this lessee may have contracted without saying anything with respect thereto would have the same right in case of the assignment of lease and would not have it in case of the sublease.

"To assign a lease or to make a sublease is not then the same thing and our article so indicates, since it explains that the lessee may sublease and even cede his lease. In subleasing the lessee makes himself lessor, while when he cedes his lease he makes an assignment, a sale of his rights. But it is not understood from that the same by M. Troplong, who, after having himself stated this difference (No. 129), but too summarily, tells us further on (No. 134) that to sublease is to cede a part of his lease. The error is manifest, because the sublease may be total and the assignment may be partial. When I lease you in entirety for 1,000 francs a farm which is rented to me for 800 francs, and under conditions different from those which I imposed on you, that is clearly only a sublease and not an assignment. I am clearly the lessor and not the vendor; reciprocally, if I cede you for 4,000 francs the right of enjoying in my place the half of the pasture which is rented to me, I do not make a lease but a sale. The assignment remains then an assignment, even though partial, as the sublease remains a sublease, even though it be total; and in the one case as in the other, while the assignee acquires over all or over part of the property the same rights which the assignor had, the sublessee on the contrary acquires equally, over all or over part, the particular rights which his lease gives him. Let it be well understood that it is only between the lessee and his sublessee that this is applicable, and not with respect to the lessor whose rights would not be lessened by a convention which is for him 'res inter alios acta.' When the sublessee finds himself to have a right which the lessee does not himself have towards the lessor, he may only act against this lessee, wnether it be in order to have this right assented to by the lessor, or that he pay damages, or finally that he submit to a resolution of the sublease,

a resolution which would not modify in any respect the principal lease. Besides, while a new convention of the lessee with the third person has its effect, the position of the lessor is better and he is given two obligees instead of one, since he may, if his lessee does not pay him, act against the third person, debtor of his debtor. In order that it be otherwise and the first lessee be discharged, the new lessee responding alone for the rents in his place, it is necessary that the lessor consent either expressly or tacitly."

Aubrey & Rau, vol. 5, p. 336, says:

"2. The assignment of lease consists in the transmission of the rights and obligations which it confers or imposes on the lessee. It does not constitute a new lease; and its effects are determined, not according to the rules relative to the contract of lease, but according to those which regulate in general the assignment of personal rights, from which the following consequences result:

"(a) The assignee does not enjoy, for the price of the assignment, the privilege established by article 2102—1.

"(b) The assignee may not invoke against the ceding lessee the disposition of article 1720, but is obliged to receive the thing rented in the state which it is found at the moment of the assignment.

"(c) The particular clause by which the lessor and lessee might have derogated from the general principles on the contract of lease may be opposed to and profited by the assignee independently of all stipulation in this respect.

"(d) The assignee has a direct action against a lessor to constrain him to the accomplishment of all the obligations which he had contracted towards the lessee. On his part, the assignee is directly held towards the lessor for the obligations resulting from the lease, and may, when the lease has been made by authentic act, be pursued by the executory process stipulated for the payment of rent, although the assignment has been passed only by an act under private signature.

"3. Different from the assignment of lease, a sublease constitutes a new lease and its affects are regulated, except the particular stipulations with which it may have been accompanied, by the general principles of the contract of lease. It results, therefore:

"(a) That the sublessor enjoys for the price of his sublease the privilege established by article 2102—1.

"(b) The sublessee, by virtue of article 1720, may demand of the sublessor the delivery of the thing rented in good state of repair.

"(c) That the particular clause of the original lease by which it may have derogated from the general principles on the contract of lease, may neither be invoked by or opposed to the sublessee.

"4. Even though the sublease constitute a new lease, it creates, nevertheless, a direct relationship between the original lessor and the sublessee. This latter may, within the limits of his sublease, demand directly of the principal lessor the accomplishment of those obligations which he has contracted towards the principal lessee. Reciprocally, the original lessor enjoys a direct action against the sublessee for the execution of the engagements resulting from the sublease and notably to maintain against him the responsibility established by articles 1733 and 1734. But when he pursues him for the payment of rent due by virtue of the sublease, he is obliged to admit as credits the sums paid to the principal lessee for rent already due. With regard to payments made by anticipation, the sublessee may not offset these against original lessor even where they have been made by virtue of a clause of the sublease or conformable to the custom of the place. Article 1753.

"To the extent that he has a direct action against the sublessee, the original lessor has in his own right a privilege on the movables of this latter; and he enjoys for the exercise of this privilege the advantage of provisional seizure. Code of Procedure, art. 820."

Our conclusion is that the production of oil by Autrey, which was going on when this suit was filed, and the payments of royalties by him to the plaintiffs, kept the lease in force, not only on the 20 acres of land, but also on the 180 acres retained under lease by the Sun Oil Company. It is said in the brief of the learned counsel for appellees that Autrey's wells, on the 20 acres, had ceased producing oil in paying quantities in January, 1926, when this suit was filed. The fact is—and it is not disputed—that the wells produced 2,094 barrels of oil from the 1st of January to the 1st of September, 1926. The plaintiffs virtually conceded in their petition that the production of oil and the payments of royalties by Autrey kept the lease in force on the 20 acres of land, for they sued only for a forfeiture of the lease on the 180 acres retained by the Sun Oil Company, on

the theory of an assignment, instead of a sublease, to Autrey. From our conclusion that Autrey had not merely an assignment, but a sublease, it follows that his preventing of a forfeiture of the lease on the 20 acres prevented also a forfeiture of the lease on the remaining 180 acres of land. The defendant's plea of prematurity, or exception of no cause or right of action, because of the plaintiffs' admission that the lease on the 20 acres was not forfeited, was therefore well founded and should have been sustained.

The judgment appealed from is annulled, and the plaintiffs' suit is dismissed, at their cost.

### On Application for Rehearing.

PER CURIAM. The appellees contend in their application for a rehearing that the judgment appealed from should have been affirmed because R. L. Autrey quit producing oil on the 20 acres of land in the latter part of August and removed his drilling rig and equipment in September or October, 1926. That was during the pendency of this suit, and about nine months after it was filed. It is true that the plaintiffs filed a supplemental petition in November, 1926, alleging those facts, but the prayer of the supplemental petition was merely for judgment "as prayed for in the original petition," and the prayer of the original petition was for a forfeiture of the lease on all but the 20 acres of land subleased to E. A. Elliott and assigned to R. L. Autrey. In the opinion which we rendered in this case it was said that the defendant's plea of prematurity or exception of no cause or right of action was well founded and should have been sustained by the district court. In view of the limitation in the prayer of both the original and supplemental petition, we adhere to that opinion; for the plaintiffs had no right to demand that the lease be forfeited and canceled as to only a part of the land and left in force as to an-

165 LOUISIANA REPORTS

other part of it. But the decree which we rendered was in fact based, not on the plea of prematurity or exception of no cause or right of action, but on the merits of the case as disclosed by the evidence adduced. The petition for a rehearing is therefore denied.