# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2025

Lyle W. Cayce
Clerk

————————

No. 23-11120

————————

IN THE MATTER OF PLACID OIL COMPANY,

*Debtor*,

PLACID OIL, L.L.C., *formerly doing business as* PLACID OIL
COMPANY,

*Appellant*,

*versus*

AVALON FARMS, INCORPORATED, *formerly known as* AVALON
PLANTATION, INCORPORATED,

*Appellee*.

————————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-1560

————————————————————————

Before JONES, WILLETT, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:*

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-11120

Debtor-Appellant, Placid Oil, L.L.C., appeals the bankruptcy court's determination that the claims asserted by Avalon Farms, Inc. ("Avalon"), were not discharged in Placid's Chapter 11 bankruptcy proceeding. Finding no error, we AFFIRM.

## I.

In this appeal, Placid challenges the bankruptcy court's determination that Avalon's claims were *not* discharged pursuant to the plan of reorganization that the bankruptcy court confirmed, in September 1988, in Placid's Chapter 11 bankruptcy proceeding. When reviewing the decision of a district court acting as an appellate court, we "apply[] the same standard of review to the bankruptcy court's conclusions of law and findings of fact that the district court applied." *In re JFK Cap. Holdings, L.L.C.*, 880 F.3d 747, 751 (5th Cir. 2018) (quoting *Barron & Newburger, P.C. v. Tex. Skyline, Ltd.* (*In re Woerner*), 783 F.3d 266, 270 (5th Cir. 2015) (en banc)). Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *Matter of Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). Mixed questions of law and fact also are reviewed *de novo. Id.*

## II.

Avalon owns a 20-acre parcel of land in St. Mary Parish, Louisiana (hereinafter, the "20-Acre Parcel"), where Placid previously operated a gas-processing plant. The history of Placid's operations on the 20-Acre Parcel begins in the early 1960's when Placid and other energy companies decided to build a natural gas plant there. In furtherance of those plans, Ernest Cockrell, Jr. ("Cockrell") leased the property from Avalon's predecessors-in-interest, Ara Bateman Zenor, *et al.* (hereinafter referred to, collectively, as

2

"the Zenors"), on October 12, 1962.[1] The written lease agreement granted Cockrell (his heirs, successors, assigns, and sublessees) the right to exclusive use of the premises for all purposes necessary for, or relating to, *inter alia*, the "processing and handling oil, gas, or other hydrocarbons." For the sake of simplicity, we hereinafter refer to the October 12, 1962 agreement as "the 1962 Surface Lease." Subsequently, on June 10, 1965, Cockrell and Placid entered into an agreement (hereinafter, "the 1965 Agreement") wherein Cockrell, *inter alia*, conveyed an undivided one-half (1/2) of his interest in the 1962 Surface Lease to Placid.

Between 1967 and 1991, Placid constructed and operated a natural gas processing plant on the 20-Acre Parcel. The first phase, Patterson I, was built in 1967. Construction on the second phase, Patterson II, commenced in 1976; operations began in 1979. By mid-August 1982, Patterson I ceased operations as a "gas processing" facility but, for a period of time, continued to be used for "gas dehydration, storage, and sales." Placid operated Patterson II, which it co-owned, until March 1991, when it sold its interests in Patterson I,

---

[1] In addition to Ara Bateman Zenor, the lessors included Mercedes Zenor Thompson, Ara May Zenor DeGravelles, Sr., and Willie Zenor Cooke. Ara Bateman Zenor was the wife of Oscar Zenor, who acquired the property (for purposes of cane farming and sugar manufacturing) by Sheriff's sale, in March 1925, from Avalon Sugar Company, Inc. *See* August 16, 2021 Declaration of Leah Guarisco McGriff. As a result of the partition of the Zenor estate in 1976, Maria T. Guarisco (a grandchild of Ara Bateman Zenor and Oscar Zenor) acquired a 100% ownership interest in the property. *Id.* Subsequently, in 1990, Maria T. Guarisco formed Avalon Plantation, Inc., as a holding company for the interests she had acquired from the Zenor estate. *Id.*

Upon her death in December 2000, Maria T. Guarisco's five children (great-grandchildren of Ara Bateman Zenor and Oscar Zenor), including Leah Guarisco McGriff, became the sole owners and officers of Avalon Plantation, Inc. *Id.* And, in September 2021, the corporation's name was changed from Avalon Plantation, Inc., to Avalon Farms, Inc.

No. 23-11120

Patterson II, and "the underlying surface leasehold" (the 1962 Surface Lease) to Torch Operating Company.

In the interim, on August 29, 1986, Placid commenced a Chapter 11 bankruptcy proceeding by filing a voluntary petition for relief. A little over two years later, on September 30, 1988, the bankruptcy court entered an order (hereinafter, "Confirmation Order") confirming Placid's consensual "Modified Fourth Amended Joint Chapter 11 Plan of Reorganization" (hereinafter, "Plan of Reorganization"). The Confirmation Order discharged "all claims against Placid that arose on or before September 30, 1988," except for "[c]laims, obligations, or liabilities" assumed under the Plan of Reorganization. The Confirmation Order also prohibited claimants from suing Placid for debts or claims that had been discharged.[2]

Approximately thirty years later, in July 2018, the current owner of the 20-Acre Parcel, Avalon, sued several oil and gas exploration and production companies in Louisiana state court. In September 2020, Avalon amended its petition, adding Placid as a defendant and alleging that Placid's operations on the 20-Acre Parcel had contaminated the land in violation of the 1962 Surface Lease. Thereafter, in 2020, Placid initiated the underlying adversary case against Avalon, requesting that the bankruptcy court determine that Avalon's claims were discharged by the September 1988 Confirmation Order. In response, Avalon requested an order declaring that its claims related to the 1962 Surface Lease were *not* discharged.

---

[2] The bankruptcy case was closed by order entered on April 7, 1997. Due to a rising number of lawsuits against Placid, however, the bankruptcy court re-opened the bankruptcy case in January 2009, at Placid's request, so that Placid could file adversary proceedings seeking determinations as to whether post-confirmation claims being asserted against it were discharged by the Confirmation Order.

No. 23-11120

Eventually, the parties filed cross-motions for summary judgment. *Id*. The bankruptcy court agreed with Avalon's position, granted its motion, denied Placid's motion, and entered judgment in favor of Avalon. The district court affirmed the bankruptcy court. The instant appeal followed.

III.

Placid maintains, as it did in the bankruptcy and district courts, that Avalon's claims were discharged, in September 1988, by the Confirmation Order that was entered in its Chapter 11 bankruptcy proceeding. In this instance, whether Avalon's claims were discharged in Placid's bankruptcy case turns on whether Avalon's predecessors-in-interest, the Zenors, were entitled to prior *actual* notice of Placid's bankruptcy case, including the Plan of Reorganization, the bar date(s) for filing claims, and the Confirmation Order.[3]

The Zenors' entitlement to actual, rather than constructive, notice is determined by whether the Zenors and Placid were parties to an executory contract during the pendency of the bankruptcy case.[4] If they were, the

_____

[3] Placid does not dispute that it did not provide actual notice to the Zenors. It did, however, provide actual notice to Cockrell Oil Corporation and Pennzoil Producing Company (because, in 1985, Cockrell's successors had sold his interest in the 1962 Surface Lease to Pennzoil).

[4] Regarding "Executory Contracts," paragraph 19 of the Confirmation Order states, in relevant part: "Except as otherwise provided . . ., the assumption or rejection of executory contracts and unexpired leases as provided in Article IX of the Plan [of Reorganization] be, and it hereby is, approved." Per Placid's Plan of Reorganization, Article IX, Section 9.1: "All Executory Contracts that have not as of the Confirmation Date been rejected shall be assumed as of the Confirmation Date." *See* Article IX, Sections 9.1 and 9.2. As to assumed executory contracts, the Plan of Reorganization also provides for the cure of existing default (provided that a proof of claim for the alleged cure amount be filed within 30 days from assumption). Finally, Article IX, Sections 9.3 and 9.4 of the Plan of Reorganization addresses the filing of claims for damages alleged to arise from the

No. 23-11120

Zenors would not have been provided the actual notice to which they were entitled, and, therefore, the claims against Placid now asserted by Avalon would not have been discharged. *See Century Indem. Co. v. Nat'l Gypsum Co. Settlement Tr.* (*Matter of Nat'l Gypsum Co.*), 208 F.3d 498, 504–06, 510–14 and n.4 (5th Cir. 2000) (holding that the debtor had a responsibility to assure that the non-debtor was provided actual formal notice of the debtor's intent regarding assumption of contracts); 11 U.S.C. § 365 (addressing assumption and rejection of executory contracts and unexpired leases); *see also* FED. R. BANKR. PROC. 6006 (addressing assumption and rejection of executory contracts and unexpired leases as part of a plan).

The district court and the bankruptcy court concluded that Placid and the Zenors had the necessary contractual privity during the relevant time period. In support of this determination, both courts decided that, under Louisiana law, the 1965 Agreement between Cockrell and Placid effected an *assignment*, rather than a *sublease*, vis-à-vis the 1962 Surface Lease. Consequently, at the time of Placid's Chapter 11 bankruptcy proceeding, Avalon's predecessors-in-interest, the Zenors, as lessors, and Placid, as one of the lessees, were parties to an unexpired lease of immovable property—the 1962 Surface Lease. In other words, Placid and the Zenors were in contractual privity.

Louisiana distinguishes an "assignment" of a lease from a "sublease." In *Hebert v. Hines*, a Louisiana court of appeal explains:

> The act of assigning a lease is different from the act of subleasing; the former conveys greater rights than the latter and different consequences emanate from each. *Serio v. Stewart*

---

rejection of an Executory Contract and the classification of "Allowed Claims arising out of the rejection of Executory Contracts."

*Investments, Inc.*, 427 So. 2d 692 (La. App. 4th Cir. 1983), *writ denied*, 430 So. 2d 97 (La. 1983).

*See Hebert v. Hines*, 615 So. 2d 44, 46 (La. App. 3 Cir. 1993). Another Louisiana appellate court elaborates:

> Louisiana jurisprudence provides that when parties enter into a sublease, a new contract comes into existence, which is separate and distinct from the original lease between the owner and the sublessor. There is no privity of contract between the sublessee and the original owner-lessor. "The sublessee is not considered as an original lessee and may only exercise rights under the original lease through the original lessee." *Webb v. Theriot*, 97-624 (La. App. 3 Cir. 10/29/97), 704 So. 2d 1211, 1214.

*Dixie Services, L.L.C. v. R & B Falcon Drilling USA, Inc.*, 2005-1212 (La. App. 4 Cir. 3/21/07), 955 So. 2d 214, 222, *writ denied*, 2007-0801 (La. 6/1/07), 957 So. 2d 182; *Hebert*, 615 So. 2d at 45 (same).

Our review necessarily begins with an analysis of the language of the 1965 Agreement because, "[u]nder Louisiana law, a contract is the law between the parties, and is read for its plain meaning." *In re Liljeberg Enterp., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002) (citing *Exxon Corp. v. Crosby–Mississippi Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998)). Notably, the 1965 Agreement is entitled "Assignment of Interest in Leases and Right of Way," and defines Cockrell as "Assignor" and Placid as "Assignee." Additionally, the operative portion of the agreement states that Cockrell "does hereby GRANT, ASSIGN, and CONVEY unto [Placid] . . ., hereinafter called 'Assignee,' its successors, sublessees, and assigns, . . . an undivided one-half (1/2) of Assignor's right, title, and interest in and to the following lease[] covering land situated in St. Mary Parish, Louisiana. . . ." Regarding the conveyance of an interest to Placid, the word "sublease" is not used.

No. 23-11120

Under Louisiana law, however, the true character and nature of a document is not determined solely by its title or labels. *See, e.g., Smith v. Sun Oil Co.*, 116 So. 379 (La. 1928); *Smith v. McKeller*, 638 So. 2d 1192, 1195 (La. App. 1st Cir. 1994). Rather, the entirety of its substance must be considered. *McKellar*, 638 So. 2d at 1195. Consequently, though we note its prevalence in the documentation, the 1965 Agreement's repeated usage of the word "assign" (even coupled with the absence of the word "sublease") does not end our inquiry.

Unfortunately, a review of the Louisiana decisions cited by the parties and the bankruptcy and district courts reveals that deciding whether an agreement constitutes an "assignment" rather than a "sublease," under Louisiana law, is not always a simple task. Indeed, as explained by the Louisiana Supreme Court, in *Smith v. Sun Oil*: "Every sublease is, in a sense, an assignment, but every assignment of a lease is not a sublease." 116 So. at 380. Additionally, given the broadly stated legal principles set forth in some Louisiana cases, ascertaining the appropriate test(s) to resolve the "assignment or sublease" determination is also a convoluted endeavor.[5]

But, regarding particular aspects of the transaction, an agreement imposing an obligation on the assignee in favor of the assignor—such as an obligation to pay additional rent or reservation of an overriding royalty—is indicative of a sublease. *See, e.g., Broussard v. Hassie Hunt Tr.*, 91 So. 2d 762, 764 (La. 1956); *Hebert*, 615 So. 2d at 46. The same also may be true of a transferor's reservation of control over an interest, including a required

_____

[5] The discussion in *Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.*, 46,153 (La. App. 2 Cir. 3/23/11), 63 So. 3d 159, *writ denied sub nom. Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.*, 2011-1225 (La. 9/23/11), 69 So. 3d 1161, *and writ denied*, 2011-1236 (La. 9/23/11), 69 So. 3d 1162, provides some background for and explanation of this lack of clarity.

reversion of an interest to the transferor. *See Prestridge v. Humble Oil & Refining Co.*, 131 So. 2d 810, 823–25 (La. App. 3 Cir. 1961). In any event, it is evident that context matters.

Placid contends that the 1965 Agreement is a sublease, rather than a "true assignment," because:

> (a) Cockrell retained certain interest and control under the terms of the agreement; (b) the agreement imposed additional duties on Placid not contained in the original [1962] Surface Lease between Cockrell and the Lessor; and (c) the agreement did not grant Placid all of the rights that Cockrell had in the original [1962] Surface Lease with the Lessor."

In support of its contentions, Placid stresses that Cockrell transferred only an undivided one-half of his "right, title, and interest" in the 1962 Surface Lease, rather than the entirety of that interest, and that Section VII of the 1962 Surface Lease grants Cockrell, as Lessee, the absolute right to release acreage from the lease.

Conversely, Placid argues, the 1965 Agreement "restrict[s] Placid's ability to exercise this right-to-release without first offering a reassignment to Cockrell[,]" such that "Cockrell retained certain interest and control." Additionally, Placid contends: "Cockrell remained at all times the only party responsible for paying rent [directly] to the Lessor[]," whereas, "[h]ad the 1965 Agreement been a true assignment, . . . Placid would have paid  its 50% share of the rent directly to the Lessor[.]"

Given the joint and equal ownership aspect of the relationship that the 1965 Agreement created between Placid and Cockrell, the district and bankruptcy courts were not persuaded by Placid's assertions. The district court concluded:

No. 23-11120

> [T]he 1965 Agreement is an assignment, as it conveys "an un-divided" portion of Cockrell's rights, provides both parties equally with a first right of refusal, and divides rent obligations equally, which is consistent with joint ownership. The rent provision further divides the interest between Cockrell and Placid based on their respective ownership in the Surface Lease, consistent with joint ownership. Because the 1965 Agreement was an assignment, Placid was a party to the Surface Lease, Placid was a direct tenant of Avalon, and Placid had contractual privity with the underlying landowners.

*See* October 3, 2023 Memorandum Opinion and Order at 7–8. The district court reasoned that the right-to-release provisions of the 1965 Agreement "essentially grant[] equally a right of first refusal to both parties," in contrast to "a reversion interest in a sublease, in which the retention of rights is not shared equally, but with the Assignor retaining the rights against the Assignee." *Id.* at 7. [6] Additionally, though Cockrell would continue to transmit rental payments and any additional amounts due to the Zenors, "the [1965] Agreement again splits responsibility between both parties equally . . . in proportion to their ownership." *Id.*

> The bankruptcy court employed similar logic, explaining:

> As discussed above, Placid agreed to assume the covenants and obligations of the [1962 Surface Lease], which included the obligation to pay rent. The court reads the [language in the 1965 Agreement regarding the payment of rentals due] as a payment mechanism consistent with an assumption of an interest in the underlying [1962] Surface Lease. It is not consistent with a

---

[6] The relevant provision of the 1965 Agreement states: "If at any time either [Cockrell] or [Placid] does not elect to maintain his or its interest in . . . said lease[] in force and effect . . . and the other party does so elect and takes the necessary action to maintain said lease or leases in force and effect . . . the non-electing party shall promptly execute and deliver to the other party a reassignment of his or its interest in such lease or leases[.]"

> sublease . . . [,] which would have required an independent rent amount based on something other than an ownership interest. The language of the [1965] Agreement does not indicate that the word "ownership" means anything other than the plain definition of the word. This apparent inconsistency between the [1965] Agreement and the [1962] Surface Lease is consistent with joint ownership resulting from an assignment and not a sublease.
>
> While these two rights—the right to release and the exclusive right to make rent payments—were altered by the [1965 Agreement], they were altered in a way that reflects joint ownership rather than a new sublessor-sublessee relationship. The court finds that the [1965 Agreement] was an assignment of 50% of Cockrell/Original Lessee's interest in the [1962] Surface Lease to Placid. Therefore, Placid was a lessee of Avalon's Predecessor [the Zenors], and the . . . parties shared contractual privity. As such, Avalon's Predecessor [the Zenors] was a counterparty to an unexpired lease with Placid.

*See* June 3, 2022 Memorandum Opinion and Order at 24.

Considering the instant record and applicable law, we are not persuaded that the district court and the bankruptcy court erred in their resolutions of this issue.[7] In addition to the reasons stated by those courts, we note that the 1962 Surface Lease clearly contemplates changes in the makeup of the parties to that contract. Article X of the agreement provides that, as used therein, the word "Lessee" includes Cockrell's "heirs, successors, assigns, and sublessees." And Article XI of the 1962 Surface Lease states, without limitation or imposition of a consent requirement: "The right of either party hereunder may be assigned or subleased in whole or in part, and the

---

[7] *Cf. Hoover Tree Farm, L.L.C.*, 63 So. 3d at 178–81.

provisions hereof shall extend to the heirs, successors, assigns, and sublessees of the parties hereto."

Also, Placid is hardly in a position to claim unfairness or surprise regarding the 1962 and 1965 contracts' being interpreted to place it in contractual privity with the Zenors. As noted, the 1965 Agreement expressly references the 1962 Surface Lease by its public recordation information and other material details. Furthermore, the very purpose of the 1965 Agreement was its use with the 1962 Surface Lease—as evidenced by the 1965 Agreement's provisions *expressly* subjecting it to the "terms, conditions and provisions" of the earlier contract, and equating the Assignee's acceptance of the agreement with an express assumption of the 1962 Surface Lease's "covenants and obligations." Finally, as the various agreements and other documentation discussed in Avalon's brief reveal, Placid, at all relevant times, was well aware of the Zenors' identities and status relative to the 20-Acre Parcel, the 1962 Surface Lease, and the 1965 Agreement.

## IV.

We find no reversible error in the district court's or the bankruptcy court's rulings. Because Avalon's predecessors-in-interest, the Zenors, and Placid were parties to an executory contract during the pendency of the bankruptcy case, Placid was obligated to provide the Zenors with actual notice of the proceeding. But it did not. As a result, Avalon's instant claims were not discharged in Placid's Chapter 11 bankruptcy case. Accordingly, we AFFIRM.