## PALMER v. BENDER, Collector of Internal Revenue.

### No. 1904.

District Court, W. D. Louisiana, Shreveport Division.

March 4, 1931.

Fred R. Angevine, of New York City, and Smitherman, Tucker & Mason, of Shreveport, La., for plaintiff.

Philip H. Mecom, U. S. Atty., and J. Fair Hardin, Asst. U. S. Atty., both of Shreveport, La., and E. O. Hanson, of Washington, D. C., for defendant.

DAWKINS, District Judge.

Plaintiff brings this suit to recover the sum of $212,937.80, paid under protest as income taxes for the years 1921 and 1922. It is one of forty-five similar cases consolidated for the purpose of trial. The claim arises out of two agreements affecting oil production, known as the "J. E. Smitherman Special Account" and George O. Baird partnerships, respectively.

. With respect to the J. E. Smitherman special account partnership, I find as follows:

Smitherman, for himself and associates, during the year 1919, made an agreement with property owners in the vicinity of Haynesville, La., that, if provided with mineral leases to as much as 15,000 acres of land, he would drill within eight months a test well for the discovery of oil or gas. The leases also provided for the payment of 50 cents per acre, as rentals, and a royalty of one-eighth of the minerals produced. Approximately 26,000 acres were leased, in which the interest of plaintiff was .15% per cent. A number of dry holes were drilled during the years 1919, 1920, and 1921, but on March 30th of the latter year a well was brought in on what was known as the Anna Taylor lease, covering the northwest quarter of section 14, township 23 north, range 8 west, Louisiana meridian, with an established daily production of 7,000 barrels. The discovery was made in what was conceded to have been "wild-cat" territory.

On April 18, 1921, Smitherman entered into a contract with the Gilliland Oil Company, in which, for the sum of $750,000, "to be paid in cash and property as hereinafter set forth," he agreed to "sell, assign and set over" to said company, and it agreed "to buy, without warranty, but with full subrogation of all rights and actions of warranty," an undivided one-half interest in one 40 acres of the said Anna Taylor tract, to wit, the northwest quarter of the northwest quarter of section 14, township 23 north, range 8 west, on which the discovery well was located, and 80 acres in section 11, adjoining it, together with all drilling wells, equipment, tankage, derricks, etc., situated on the Tay-

lor property, as well as the oil which had been produced; and, of which price, the sum of $600,000 was to be attributed to the property so described. For the balance of $150,000, Smitherman bound himself to convey certain other leases. As part of the consideration, he agreed to accept, at a value of $250,000, a one-half interest in a certain tank farm, equipment and facilities for handling the oil, including pipe lines built and to be built. It was also stipulated that all of the property, including that to be conveyed by Smitherman, and in which he was to acquire an interest, should be "operated as a partnership property," under the control and supervision of the Gilliland Oil Company, but with the right of the former to be consulted as to the general policy of "drilling and exploiting the leases and marketing the oil." Further provision was made allowing Smitherman to sell his part of the oil, if he saw fit, and all expenses were to be borne equally by the parties, with settlements to be made on the 15th of each month for the month preceding. Other details of operation were provided which are unimportant to this case.

Thereafter, on April 21st, the parties, that is, Smitherman and the Gilliland Oil Company, entered into a second agreement, in which it was stipulated that the former, "for the consideration hereinafter set forth, * * * does by these presents, sell, assign, set over, transfer and deliver, without warranty, but with full subrogation of all rights and actions in warranty" to the latter, "its successors and assigns," an undivided one-half interest in the 40 acres on which the discovery well was located, the said well and all equipment, the oil, etc., and "a like interest in and to the drilling well known as Taylor No. 4, subject, however, to the obligation of the assignee to pay and discharge one-half of the costs and expense of drilling said well. * * * *" The consideration stated was $600,000.00, "cash in hand paid, * * * *" the receipt of which was acknowledged. It was further provided that "all conditions between the parties" should extend to their heirs and assigns.

On April 23, 1921, which was also within the 30-day period provided by the revenue law of that time for a revaluation for depletion, another agreement was made with the Ohio Oil Company covering the remaining 120 acres of the northwest quarter of the northwest quarter of section 14, township 23, range 8 west, known as the Anna Taylor tract. The contract recited that Smitherman, for the consideration expressed, did "sell, assign, set over, transfer and deliver, without warranty or recourse, but with full subrogation of all rights or actions of warranty," the said 120 acres. The price stipulated was $3,000,000.00, "cash in hand paid, * * * and the obligation of said the Ohio Oil Company to pay over and deliver unto the assignor, his successors and assigns, the sum of $1,000,000.00 out of one-half of the first oil produced * * * subject to the further obligation * * * to pay over and deliver into said assignor, his heirs, executors and assigns, the equal one-eighth of all oil produced * * * as an excess royalty." Provision was also made with respect to casing head gasoline, and for settlement on the 15th of each month.

The $3,000,000 was paid in cash, and the additional $1,000,000 was subsequently received from the proceeds of one-half of the oil, as agreed.

Simultaneously with the execution of the agreement, there was delivered to Smitherman the following letter from the Ohio Oil Company: "With reference to the act of assignment executed this day by you unto The Ohio Oil Company transferring and conveying unto said company one hundred and twenty-eight oil, gas and mineral leases covering and affecting lands situated in Claiborne Parish, Louisiana, in Twp. 22 North Ranges 7 and 8 West, and in Twp. 23, North, Ranges 6, 7 and 8 West, this writing is addressed to you for the purpose of expressing the agreement of this company that if at any time hereafter we shall elect to release, surrender, or cancel all or any part of any one or all of said leases then before effecting such release or cancellation, such lease or leases, or part or parts thereof will be first offered to you, and if you shall request, same will be reassigned or reconveyed to you by this company instead of being released or surrendered direct to the lessors."

Subsequently, on July 12, 1921, Smitherman and the Ohio Oil Company executed a further contract, providing for the gathering, storing, and disposing of the one-eighth royalty which had been reserved by the former and for the conveyance to Smitherman of one-eighth of the interest held by the Ohio Oil Company in certain other leases, including tanks erected thereon, upon the payment of $1,500 cash and one-eighth of the expenses incident to erecting the tanks. Further stipulations were made for the marketing of Smitherman's one-eighth interest in the oil, covering the construction of switch tracks, for the giving of division orders and declar-

ing that the company should not be responsible to Smitherman for his portion of any oil lost by evaporation, fires, etc.

The plaintiff in this case was also a member of the Geo. O. Baird partnership. Baird, acting on behalf of himself and associates, acquired a lease on a tract of land in the Homer field of Claiborne parish, and discovered oil thereon on August 23, 1919. The Commissioner of Internal Revenue recognized his right to the benefits of depletion. On December 10th of the same year he made a contract to sell the property to one J. Rogers Flannery, for the price of $2,500,000, under terms and conditions which required the execution of a transfer, after the payment of a certain portion of that price. A first payment of $350,000 was made, but the contract was not otherwise performed, and suit was brought by Baird for its annulment. On January 9, 1921, the state court rendered judgment annulling the agreement, on condition that the $350,000 paid by Flannery should be returned to his assignee, John Munhall, Jr.

On November 16, 1920, Baird made an agreement with the Gulf Refining Company of Louisiana, reading as follows:

"This agreement between George O. Baird, husband of Estella Mitchell, a resident of Caddo Parish, Louisiana; and the Gulf Refining Company of Louisiana, a corporation under the laws of the State of Louisiana, and domiciled at Orleans Parish, witnesseth:

"1. That said Baird is the owner of an oil and gas lease covering all of the S½ of the NE¼ of Section 24, Township 21 North, Range 8 West, less the West 30 acres thereof; and less also about one (1) acre in a Square in the southwest corner of said described property, as to which one acre, however, the said Baird is the owner of an undivided one-half (½) interest, the Gulf Refining Company of Louisiana being the owner of the other undivided one-half interest in the lease covering the said one acre; the least above referred to including the eleven (11) oil wells on the said property, all the equipment thereto annexed and attached, together with the interest of the said Baird in the one well located on said one acre tract hereinabove referred to."

"2. For and in consideration of the obligations and agreements hereinafter set out, the Gulf Refining Company of Louisiana has obligated itself and does hereby agree to take possession of the said lease, to equip same properly at its own expense, and to operate such wells diligently for the production of oil, and to maintain the said production as long as oil may be produced therefrom in paying quantities; all such equipment and operation to be at the entire expense of the Gulf Refining Company of Louisiana and free from any expense whatsoever to the said Baird. And all taxes of every character legally assessed and charged against said lease, including all severance tax on the production therefrom, except as to the royalty interests, shall be paid by the Gulf Refining Company of Louisiana."

"3. For and in consideration of the obligation of the Gulf Refining Company of Louisiana, to equip and to operate said property free of expense to him, the said George O. Baird agrees that the Gulf Refining Company of Louisiana may retain from the production of the said property, forty per cent (40%) of the oil produced therefrom, the agreement between the parties being that out of the said 40 percent so retained by the Gulf Refining Company of Louisiana, the Company shall deliver the royalty of one-eighth (⅛) of the oil, as provided for in the lease covering said property, and shall in addition deliver to the said Baird for a term of three (3) years, beginning the 1st day of November, 1921, one-twenty-fourth (1/24) of all the oil that may be saved from that produced from the said property, the said delivery to be made in the same manner in which the royalty is to be delivered to the lessors, under the provisions of the original lease."

"4. In consideration of this obligation and agreement, as hereinabove set out, the Gulf Refining Company of Louisiana shall have, however, the right to all of the gas, including casing-head gas, extracted from the wells on the said property, and all profits therefrom accruing, subject to such contracts as it may be able to secure from the lessors of the said property, and free from any obligation to account to the said Baird for any of the said gas or any of the profits derived from its manufacture or sale."

"5. The Gulf Refining Company of Louisiana has this day loaned to the said George O. Baird, the sum of Three Hundred and Fifty Thousand ($350,000.00) Dollars, on the sole security of the said lease, without any personal liability. And, in order to secure the repayment of the said sum within thirty (30) months from this date, the said Baird has, and does by these presents, mortgage and hypothecate unto the said Gulf Refining Company of Louisiana, all of his right, title and interest thereto, and, in addition to further secure said obligation, pledges unto

the said Gulf Refining Company of Louisiana, all of the oil that may be saved from that produced from the said leased lands, after the delivery of the royalty of one-eighth ($\frac{1}{8}$) to the lessors, and the one-twenty-fourth ($\frac{1}{24}$) to the said Baird, as hereinabove provided."

"It is distinctly agreed and understood, however, that the Gulf Refining Company of Louisiana will, as hereinabove set out, deliver to the said Baird sixty percent (60%) of the oil produced from the said property, notwithstanding the said mortgage and pledge and free from any claim thereunder, until the said Baird shall have received from the said production sufficient oil to yield him, at the market price prevailing on the date of delivery, and at which price he will be able to sell said oil, the sum of Three Hundred and Twenty-Five Thousand ($325,000.00) Dollars, from the 60 percent (60%) of the oil produced from the said property, which the said Gulf Refining Company of Louisiana has under this agreement obligated itself to deliver."

"After the said Baird shall have received from the 60 percent of the oil so delivered to him the sum of $325,000.00 or after the expiration of the 30 months from this date, if the said Baird shall not have received such amount from the said production within that time, then the Gulf Refining Company of Louisiana shall have the right to apply such 60 percent of the oil, or the proceeds thereof, to the repayment of the said loan until same shall have been paid out in full, without interest."

"6. In consideration of the obligations and agreements hereinabove entered into on the part of the Gulf Refining Company of Louisiana, the said Baird now agrees and obligates himself that whenever there shall have been produced from the said property by the Gulf Refining Company of Louisiana, such quantity of oil that the 60 percent which the said Gulf Refining Company of Louisiana has agreed herein to deliver to him, shall have produced the sum of Six Hundred and Seventy-Five Thousand ($675,000.00) Dollars (the first $325,000.00) of the proceeds of the sale of such oil to be retained by Baird as above provided, and the remaining $350,000.00 to be retained by said Company, to be applied by it to the liquidation of the indebtedness above set out, that he will then sell, assign, convey, and deliver to the said Gulf Refining Company of Louisiana the entirety of the said mineral lease hereinabove referred to and forming the subject matter of this contract, for the consideration of the obligation upon the part of the Gulf Refining Company of Louisiana to continue to operate said property for the production of oil therefrom in paying quantities, and to deliver to him, or his transferees, the one-twenty-fourth ($\frac{1}{24}$th) royalty out of the oil, as hereinabove provided, until the expiration of three (3) years from this date, and a royalty of one-thirty-second ($\frac{1}{32}$nd) of all the oil that may be saved from that produced, after said date, and as long thereafter as oil may be produced from the said property in paying quantities."

"7. As further security to the Gulf Refining Company of Louisiana, for the performance of the obligation to sell as set out in the last preceding paragraph, the said Baird has this day executed an assignment in favor of his entire interest in the said lease, which said assignment he agrees to deposit in escrow with such depositary as may be mutually agreed upon by the parties, to be retained by said trustee and to be delivered to the Gulf Refining Company of Louisiana, when it shall have complied with the obligations above set out and made a consideration of said assignment; said assignment so delivered in escrow shall moreover be considered between the parties as a further security for the pledge and mortgage hereinabove stipulated."

"In witness of which, this agreement has this day been executed in duplicate, the said Gulf Refining Company of Louisiana being represented therein by its Third Vice-President, C. R. Minor, being herein authorized, and this agreement being executed as of and effective from seven-thirty o'clock A. M., November 1, 1921, Shreveport, La., Nov. 16th, 1921."

As required by this agreement, the $350,000 was paid by the Gulf Refining Company of Louisiana to Munhall, and none of it was actually received by Baird.

The Gulf Company took charge of the property, and a deed was executed and placed in escrow, as stipulated, but was not delivered until 1927. During the years 1921 and 1922 the contract was performed according to its stipulations.

The plaintiff made a timely return of his income taxes for the year 1921, including therein his distributive shares in both the Smitherman special account and Geo. O. Baird partnerships, deducting therefrom as depletion, based, as to the former, upon a claimed discovery value applying both to the cash bonuses and royalties received, and, in the latter partnership, depletion was claimed

on the revaluation previously determined by the Commissioner. Plaintiff also omitted as income the $350,000 paid by the Gulf Refining Company of Louisiana to Munhall.

For 1922, similar returns were filed and deductions for depletion were made.

The claims for depletion were disallowed by the Commissioner, who also increased the net income by adding the $350,000 paid to Munhall. The plaintiff in this case on January 4, 1927, paid, under protest, his proportion of the taxes, interest, and penalties resulting from this additional assessment by the Commissioner, and made timely claim for a refund thereof on May 4, 1928, which was rejected.

■ The principal contention on the part of the Commissioner is that the agreements between Smitherman, the Gilliland Oil Company, and the Ohio Oil Company in the one instance, and between Baird and the Gulf Refining Company in the other, were all assignments or sales of the interests of the partnerships in the leases; while the taxpayer claims that they were subleases, entitling him to depletion during both years, based upon discovery value.

There is an additional issue of whether, in the Baird partnership, the Commissioner was correct in assessing as income the $350,000 paid to Munhall as Flannery's assignee.

It is conceded in the brief of plaintiff that the transfer to the Gilliland Oil Company was not a sublease. It is necessary, therefore, to consider only the transactions had between Smitherman and the Ohio Oil Company in the one instance, and between Baird and the Gulf Refining Company in the other. There are really three aspects to be considered in the claim for depletion in the Smitherman-Ohio Oil Company transaction: (1) As to the $3,000,000 paid in cash at the signing of the agreement; (2) the $1,000,000 paid out of one-half of the first oil produced; and (3) the overriding royalty of one-eighth.

I think I may say, from the arguments of both sides, that Smitherman, who was the original lessee, holding seven-eighths of the minerals which might be produced from the lands, would have been entitled, after discovery, had he developed the property himself, to such a rate of depletion throughout the life of production as would, when the minerals had been exhausted, have returned to him the fair market value of his interest in the leases at the time of discovery, or within 30 days thereafter. This appears to have

been the clear intent and purpose of the Revenue Law.

■ In those states where the lease or other conveyance of minerals is recognized as a sale or transfer of an interest in the land, sums received as bonuses, fall within the category of capital gain, to be assessed at the flat rate of 12½ per cent. upon income derived from that source. See Ferguson v. Commissioner of Internal Revenue, 45 F.(2d) 573 (C. C. A. Fifth). As was said in the case just cited, the amendment to the Revenue Law, differentiating that class of income and subjecting it to a flat rate of taxation, was to promote trade and to relieve the taxpayer from the heavy burden of the high rates of income taxes upon the proceeds of a capital asset. Of course this does not affect directly the question of whether or not, in a situation like the present one, the taxpayer is entitled to depletion, but it does serve to illustrate the point that Congress, in the opinion of the court, was seeking to subject to ordinary income taxation profits from trade, business and industry, and to avoid imposing it upon capital assets, except to the limited extent thus provided. That the enhanced value of property, whether it be land or mineral leases, resulting from the discovery of a rich oil pool, becomes a capital asset, which does not bear income taxes until it has been realized, either through production or conveyance of some part of such property, and then only subject to these statutory advantages, seems beyond question. Therefore, to relieve from those burdens the taxpayer, who is fortunate enough to own property in a state like Texas, or who has means to himself develop and produce the minerals while imposing them upon one in a situation like the plaintiff, works a discrimination which should not be attributed to the lawmaking body, except it be required by clear and inescapable provision of the Revenue Law.

As to the lessor, the Treasury Department recognizes the right to depletion upon bonuses or advanced royalties. That is provided for in article 215 of regulation 62 and article 216 of regulation 65 (Treasury Decision 3938) from which quotation is made as follows: "Art. 216 (215) Depletion—Adjustment of Accounts based on bonus for advanced royalty. (a) Where a lessor receives a bonus in addition to royalties, there shall be allowed a depletion deduction, in respect of the bonuses, an amount equal to the proportion of the cost or value of the property on the basic date which the amount of the

bonus bears to the sum of the bonus and the royalties expected to be received. Such allowance shall be deducted from the amount remaining to be recovered by the lessor through depletion, and the remainder is recoverable through depletion deductions on the basis of the royalties thereafter received."

Hence, if the owner of the land or original lessor had himself discovered the minerals and had leased the property to the Ohio Oil Company, receiving the bonuses paid to the plaintiff here, and retained the customary one-eighth royalty, under the Treasury Department's own regulations and method of determining the tax to be paid, he would undoubtedly have been allowed depletion, in conformity with the above-quoted formula, for the bonuses paid in cash, and by the same token, would have received similar allowance upon the additional sum subsequently paid out of one-half of the first oil produced. Had such owner sold for a lump sum the land, or the whole of the mineral interest, he would have been entitled to report and be taxed upon the discovery value as a capital gain. Under the above method of calculation, the Treasury Department (as to an owner) treats the matter as a present depletion or exhaustion pro tanto of seven-eighths of the capital value (including discovery value on the basic date), by discounting the amount of such bonus, so that the sum presently allowed will be the equivalent of what would have been received over the estimated life of production, and to which is added, by return through deduction from year to year, the estimated value as of the basic date of the remaining one-eighth reserved as royalty. The result is to ultimately return to the taxpayer the full amount of the cost of the property, plus discovery value as determined under the statute.

■ Actually, in this state the lessee's seven-eighths interest in the minerals, when he comes to make a conveyance thereof and retains an overriding royalty, is not different (except that he does not own the land, but an exclusive right to enter and withdraw the minerals) from a practical standpoint to that of the lessor or owner of the land. The latter has no right under a lease (except for default by the lessee) to a return of the property until the minerals have been exhausted. It has been held that this circumstance, i. e., the right to a reversion of the land from which the minerals have been removed, is no reason for sustaining the right to depletion in favor of the landowner as against that of the lessee, who has an interest in the mineral production by virtue of an overriding royalty. See Lynch v. Alworth-Stephens Company, 267 U. S. 368, 45 S. Ct. 274, 69 L. Ed. 660. Under the law of Louisiana, the extent of the property interest conveyed by the landowner, and that passing by an assignment from a lessee, is the same, that is, a right in the nature of a real servitude, giving to each transferee the exclusive right to enter upon, explore for, produce, and reduce to possession the minerals. Frost-Johnson Lumber Company v. Sallings' Heirs, 150 La. 855, 91 So. 207. There is no more reason in logic or law for treating the cash bonus, received by the owner of the land for that undivided portion of the interest conveyed, as advanced royalties, subject to depletion, than there is in the case of a lessee who makes a similar conveyance of only a part of his seven-eighths leasehold. I repeat that the nature of the title to the minerals under the law of this state, in each instance, is identical, whether the transfer be by what is termed a sale, assignment, or sublease. Running through the logic of all the cases which I have been able to find, as well as the regulations and decisions of the Treasury Department, the important element in determining the right to depletion appears to be the retention of an interest in the minerals which remain to be produced.

Counsel for the plaintiff argue that the issue turns upon the point as to whether the transfers amount to a sublease under the civil law of this state, as distinguished from the principles of common law. While I think the distinction contended for clearly exists, still to my mind it makes no difference what the conveyances are called, the all-important fact is that the plaintiff retained a definite and valuable interest in the property (the minerals) represented by his overriding royalty, which supplies the essential element entitling him to depletion, both under the regulations of the Treasury Department and the decisions of the Supreme Court. Lynch v. Alworth-Stephens Company, supra.

As I attempted to point out in a dissenting opinion in the case of Herold v. Commissioner of Internal Revenue (C. C. A.) 42 F.(2d) 945, the statute, section 214 (a) (10) of the Revenue Act of 1921 (42 Stat. 241), does not distinguish, or, in my judgment, authorize the distinction, as between lessors and lessees, which the ruling of the Commissioner in this case has made. It declares:

"That in computing net income there shall be allowed as deductions: * * *

"In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * * according to the peculiar conditions in each case, based upon cost * * * in the case of mines, oil and gas wells, discovered by the taxpayer * * * where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within thirty days thereafter. * * *"

The exclusion of the lessee from the benefits of these provisions is based upon a process of reasoning and interpretation which, in my opinion, is not only not supported by anything in the section itself, but is contrary to the spirit and purpose behind its enactment. Common-law authorities are cited which are not applicable in Louisiana. The Department itself, I think, recognized this underlying purpose in the Manual of Instructions which it furnished to the industry under the Revenue Act of 1918 (40 Stat. 1057), as appears from the following quoted therefrom: "The Clause from Sections 214 (a) and 234 (a) of the tax law referred to above was inserted to protect the prospector or 'wildcatter' who goes into an unknown field and overcoming hazards of the business discovers a new and valuable deposit of oil or gas, and by so doing increases the value of his holdings to such an extent that their value at the time of discovery or within thirty days thereafter is materially disproportionate to their cost. The discovery may refer to the opening up of a new pool or field or it may refer to the tapping of a new and previously unknown sand or zone in an old pool or field. The benefits, however, will accrue solely to the holdings of the taxpayer actually making the discovery. And it will affect him only in so far as he is able to prove that his discovery was bona fide, and that it has so increased the value of his holdings as to make it materially disproportionate to the cost."

The view which I have expressed above applies with whatever force it may have whether the property be situated in this state or elsewhere. However, as stated heretofore, I think there is a clear distinction between the common and civil law as to what constitutes a sublease. Under the former, there appears to be support for the proposition that there must remain some reversionary interest in the sublessor; but this is not necessary in Louisiana, where the civil law obtains. It is true that in Smith v. Sun Oil Company, 165 La. 907, 116 So. 379, there was an express provision for forfeiture in event of the failure of the transferee to comply with the obligations in favor of the lessee, but this stipulation had the effect merely of writing into the contract that which the codal provision supplied without it.

Under the common law, a lease is considered a partial alienation of the fee, with a reversion to the lessor. R. C. L. vol. 16, p. 619, verbo Landlord & Tenant, § 100. On the other hand, estates in reversion and remainder are unknown to the Louisiana law. Therefore, in the common-law states, as settled by that system, there must always be in a contract of lease, provision for reversion, express or implied, of some part of the estate (in the case of minerals alone, a portion of the mineral estate as distinguished from the land). Hence, a lessee who transfers the whole of his leasehold estate, reserving nothing in reversion for himself, does not become a sublessor, even though he receives a greater or different yearly or monthly consideration therefor. Whereas, with us, the very nature of a mineral contract, whether it be in the form of sale, assignment, or lease, is such as to convey only a right upon the property, and not a title or estate in the minerals themselves.

Our Revised Civil Code defines a lease as follows:

"Art. 2669. Lease or hire is a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a fixed price."

"Art. 2674. To let out a thing is a contract by which one of the parties binds himself to grant to the other the enjoyment of a thing during a certain time, for a certain stipulated price which the other binds himself to pay him."

The main difference between a lease and a sale or alienation in this state is that the former gives only the right of enjoyment for the specified period, while the latter vests an ownership or interest in the fee, with the consequence that in the former the lessor warrants or obligates himself to the lessee for the full enjoyment of the premises, even to the extent of necessary repairs and liability for damages for violation of such warranty; while in a sale or alienation any loss from those sources short of eviction is at the risk of the vendee or alienee. See Knapp v.

324

Guerin, 144 La. 754, 81 So. 302, and authorities therein cited; see, also, Rev. Civ. Code La. arts. 2711, 2729.

At common law, a conveyance of mineral rights which does not expressly stipulate a reversion falls into the category of a sale or assignment, and cannot be construed as a sublease. In Louisiana, regardless of the terms used, if the lessee conveys anything less than the whole of his rights, and stipulates that the transferee shall pay him a rental, which is the same under our law as royalty, whether for the whole term or less, the result is to create a sublease, with all of the rights incident thereto, such as a lessor's lien and right of pledge, action to annul, etc. Batallion Washington Artillery v. Schwartz, 161 La. 925, 109 So. 764; Smith v. Sun Oil Company, supra; Spence v. Lucas, 138 La. 763, 70 So. 796; Logan v. State Gravel Company, 158 La. 105, 103 So. 526; Board of Commissioners v. Pure Oil Company, 167 La. 801, 120 So. 373.

George O. Baird Partnership.

The Court of Appeals for this circuit, in the case of Herold v. Commissioner, 42 F.(2d) 942, 943, involving the same contract and issues out of which plaintiff's present claim arises, held that the George O. Baird partnership could not be charged with the $350,000 paid by the Gulf Refining Company to Munhall, assignee of Flannery. As one of the judges participating therein, I concurred and still believe the conclusion correct. Otherwise, the dissenting opinion which I filed in that case expresses the views which I still entertain with respect to the $325,000 which was to be paid in oil, and the overriding royalties retained by Baird.

However, the claims for depletion as to both of the partnerships herein have been decided by the Court of Appeals of this circuit contrary to the views above expressed. Waller v. Commissioner (C. C. A.) 40 F.(2d) 892; Herold v. Commissioner, supra. For this reason, I feel bound to follow those rulings until that court or the Supreme Court reaches a different conclusion.

The plaintiff is entitled to recover his proportionate share of the income taxes assessed against the $350,000 paid by the Gulf Refining Company to Munhall, but otherwise his demand must be rejected.

Proper decree may be presented. The rights of all parties are reserved to present and have settled their exceptions.