131 So.2d 810 (1961)
Robert B. PRESTRIDGE, Jr., et al., Plaintiffs-Appellants,
v.
HUMBLE OIL & REFINING COMPANY et al., Defendants-Appellees.
No. 37.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1961.
On Rehearing May 9, 1961.
*812 Parker & Parker, by John E. Parker, New Orleans, for plaintiffs-appellants.
Liskow & Lewis, by Cullen R. Liskow, Lake Charles, for defendants-appellees.
Peter R. Monrose, Jr., New Orleans, for plaintiff-appellee.
Before TATE, FRUGE and HOOD, JJ.
FRUGE, Judge.
From a judgment rendered in favor of defendants and against plaintiffs, disallowing plaintiffs' claims and dismissing plaintiffs' suit at their cost plaintiffs bring this appeal.
There is no serious dispute as to the facts involvedhowever, we are concerned primarily with questions of law. This suit arose as a result of certain transactions which occurred within the past three decades.
Plaintiffs, Robert B. Prestridge, Jr., Mrs. Allie Prestridge, wife of William E. Inbau, and Mrs. Marie Bess Prestridge, wife of Richard A. Schleif, filed suit against W. H. Cocke and R. H. Goodrich to be declared *813 owners of an undivided 3/16ths interest in certain lands. All defendants recognize that the said plaintiffs presently own an undivided 3/32nds interest in the said lands or ½ of 3/16ths. Plaintiffs cumulated with this action a demand for the partial cancellation of certain mineral leases held by W. H. Cocke and R. H. Goodrich and Humble Oil & Refining Company and for cancellation of other documents affecting their alleged ownership.
George Johnston and Albert H. Thompson purchased certain lands in indivision and equal proportions. Plaintiffs are the grandchildren of Albert Thompson and Alberta Thompson. Plaintiffs inherited by representation through their predeceased mother, from their grandmother and grandfather Thompson in 1927 and 1930 respectively, a 1/16th each for a total of 3/16ths; a major brother of plaintiffs, Albert Prestridge, inherited a 1/16th; their uncle, Ward Thompson, inherited ¼th; and the heirs of George Johnston and/or others own the remaining one-half of the property originally owned by George Johnston and Albert Thompson in indivision. In 1933, Ward Thompson, as co-owner in indivision, sued his other co-owners for a partition by licitation. Pursuant to a judgment ordering sale of the land the sheriff sold at public auction all of the property owned in indivision to one W. T. Burton. In January, 1940, H. E. Nutter, believing that the said sheriff's sale was a nullity and that it could be annulled, entered an agreement with the heirs of George Johnston, Albert Prestridge, and Robert B. Prestridge, Sr. as natural tutor of plaintiffs, whereby Nutter agreed to have the sheriff's sale to W. T. Burton set aside in consideration of an undivided one-half of the interests of the said persons in that property. (In February, 1940 Nutter acquired for $100 cash the interest of Ward Thompson.) Pursuant to the agreement Nutter employed counsel, suit was brought against Burton, and the sale was declared a nullity. See Johnston v. Burton, 202 La. 152, 11 So.2d 513. Defendants, Cocke and Goodrich, acquired the interest in question from Nutter. Plaintiffs allege that the instrument by virtue of which Nutter claimed to have acquired said property is an absolute nullity. Plaintiffs claim that their tutor had no authority to convey ½ of their interest (their interest was originally 3/16) in the property in consideration of the services which were allegedly rendered by Nutter and to be rendered by him and also for the costs and expenses which he agreed to pay in connection with the suit which was instituted resulting in the rescission of the sale to Burton. Defendants, Cocke and Goodrich, claim to have acquired the property (3/32nds) by mesne conveyance from Nutter, who had acquired it by virtue of an instrument dated January 27, 1940, from Robert Prestridge, Sr., acting as natural tutor of plaintiffs. Alternatively, defendants plead ratification, estoppel and the prescription of five years under LSA-C.C. art. 3542 and that of ten years under LSA-C.C. arts. 2221 and 3544. To the defenses of defendants plaintiffs filed special pleas of res judicata and prescription.
Robert Prestridge, Sr. applied for (with proper formalities) and was granted authority, as natural tutor, for and on behalf of the minors, Allie Prestridge, Robert Prestridge, Jr., and Marie Bess Prestridge, by order of court:
"to enter into a contract with H. E. Nutter"
authorizing him to proceed by necessary suit or suits, at his own expense and through attorneys employed by him, to attempt to set aside and nullify that sale to Burton; and further:
"that the Robert B. Prestridge, Sr., as Natural Tutor to said minors, be authorized to transfer and convey unto the said H. E. Nutter, in consideration of the services rendered by him and the expenses to be paid to attorneys and otherwise, an undivided one-half (½) interest in all of the rights, title and interests of said minors in lands in St. Martin and Iberia Parishes, Louisiana * * * including a one-half (½) interest *814 in all rights, titles and interest recovered for and on behalf of said minors in any suit or suits brought in connection therewith."
Pursuant to the above order of court Robert Prestridge, Sr., individually and as natural tutor to the said minors, and Albert E. Prestridge (the major brother of plaintiffs), on January 27, 1940, joined in an agreement with H. E. Nutter, the pertinent parts of which read as follows:
"An Agreement by and between Robert B. Prestridge, Sr., acting herein as Natural Tutor and for and on behalf of the minors, Allie Elizabeth Prestridge, Robert B. Prestridge, Jr., and Marie Bess Prestridge, acting under an order of [court] and Albert Emerson Prestridge, herein all referred to as `Grantors', and H. E. Nutter, * * * herein referred to as `Grantee'.
"Grantors, by this instrument, * * appoint the Grantee their agent and attorney in fact * * * to enter such suit or suits as may be necessary to set aside and nullify the Sheriff's deed * * * and to recover title to said lands for the Grantors according to their interests therein * * *.
"The Grantee hereby agrees to employ necessary attorneys to institute suit * * * in an attempt to set aside and nullify said deed, all at his expense, and that he shall not have the right to collect from the Grantors any portion of said expenses, nor shall he receive any consideration for his services and for the payment of such expenses, except that hereinafter set forth, and to hold grantor harmless for any costs of court.
"In consideration of the services rendered and to be rendered by the Grantee and the expenses advanced by him in connection with any suit or suits necessary to set aside said deed, the Grantors, by this instrument, bargain, sell, transfer and convey unto H. E. Nutter, Grantee * * * an undivided one-half (½) interest in and to all of the rights, title and interest of Grantors in and to the lands * * *.
"To Have And To Hold the said interest in the lands referred to unto the said H. E. Nutter * * * forever; * * * without any warranty of title but being only of an undivided one-half (½) interest in and to the rights of the said Grantors in and to the said lands, including an undivided one-half (½) interest in such interest or portion thereof that might be recovered in the event the Sheriff's deed herein mentioned should be set aside * * *." (emphasis added.)
Plaintiff maintains that there is no authority for such a sale and cites LSA-C.C. arts. 341-342 and Act 209 of 1932 (presently LSA-R.S. 9:603, 9:671 to 9:675, 9:691 to 9:693) as authority for that proposition.
Although LSA-C.C. 341 and 342 require that the sale of a minor's interest be at public sale, our appreciation of Act 209 of 1932 is that one of its primary purposes was to provide for the sale of the interest of a minor at private sale, that is, that it removed restrictions to such a sale. The pertinent parts of the Act read as follows:
"Section 1. * * * whenever it shall appear to the tutor of a minor * * * who shall own property, either in its entirety or in indivision, that it is to the advantage of the minor * * * to sell the interest of the minor * * * therein at private sale, the tutor * * * may file a petition in the District Court * * * setting forth the nature of the property, the reasons which make it to the advantage of the minor * * * to sell such interest at private sale, and the price, terms and conditions of the proposed sale. * * *
"Section 8. That any property sold under this Act may be purchased by any co-owner or co-owners thereof."
As above mentioned all formalities were complied with by the tutor.
*815 Plaintiffs cite cases holding that a private sale of a minor's interest, even when authorized by Court, is absolutely void, and that later statutes permitted such a sale only to effect a partition. See Fletcher v. Cavalier, 4 La. 267; Blair v. Dwyer, 110 La. 332, 34 So. 464; Crain v. Tremont Lumber Co., 134 La. 276, 63 So. 901; Touchy v. Gulf Land Co., 120 La. 545, 45 So. 434. However, these cases were decided prior to Act 209 of 1932 which specifically provides for the private sale of a minor's interest. Also relied on by plaintiffs are the cases of Keel v. Sutherlin, 130 La. 182, 57 So. 794; and Wells v. Files, 136 La. 125, 66 So. 749. In the Keel case, supra, the mother of the minor had sold land with the right of redemption. Later the land increased in value due to oil development in the area. The minor's grandfather, the tutor, being destitute as were the minors, agreed with certain attorneys that if they redeemed the land they would be paid a one-third interest in the land. The land was redeemed and after a family meeting etc. the tutor was authorized to deed the land to the attorneys (that is, one-third of the land) which was done. It was held that the deed to the attorneys was null as not being authorized in law. The Wells case, supra, was a similar case. However, both cases were decided prior to the enactment of Act 209 of 1932. At that time there was no provision for the private sale of a minor's interest. Act 209 supplied that mode of disposing of a minor's interest. In a recent decision handed down by this court, Peyton et als. v. Hammonds, 125 So.2d 491, 493, we had occasion to examine the same statutes (LSA-R.S. 9:671-675) in relation to the sale of the interest of an interdict. In that case we said:
"However, under the express provisions of LSA-R.S. 9:671-675 a private sale of the interest of an interdict is provided for. LSA-R.S. 9:652-653, and 671-675 provide the necessary legal steps and authorization required before the interest of the interdict may be disposed of. These provisions do not specifically set out what interests may be sold or alienated. However, there is no prohibitive language therein, and we are not inclined to supply prohibitions that the legislature did not provide for."
While the statute there under consideration does not have the same wording, nevertheless, it provides for a private sale. In the case of Cormier v. Thibodeaux, La.App., 20 So.2d 621, 623, in considering Act 77 of 1928, that court stated that:
"Again we find upon consulting the statute that there is no prohibition in any of its provisions against selling the property, no matter what the purpose, whenever it shall appear to the tutor of the minors that it is to their manifest advantage to sell it at private sale." (Emphasis added.)
Plaintiffs also cite the case of Wenk v. Anisman, 211 La. 641, 30 So.2d 567, 572, as authority for the proposition that Nutter, acting in a fiduciary capacity, could not purchase the interest of the minors in this manner (Nutter was a co-owner with the minors by virtue of his prior purchase of Ward Thompson's interest in the property). We find that the case, in respect to a tutor as fiduciary, holds that a tutor is not authorized by virtue of Act 209 to purchase his wards' interest in the land even though he be a co-owner. In the case at bar Nutter is not the tutor, but rather, he is merely a co-owner. Section 8 of Act 209 of 1932 specifically provides that a co-owner may purchase the interest of other minor co-owners. The fact that Nutter was also appointed the agent to have the Sheriff's deed annulled can have no bearingand certainly does not create in him the status of a tutor. The court, in the Wenk case, merely determined that Section 8 of the Act did not impliedly repeal the Codal Articles specifically prohibiting a tutor from buying the interest of a minor, nor did it create another mode by which a tutor could purchase the interest of his ward. That court (in the Wenk case) also stated that:

*816 "With reference to the manner in which a minor's property could be sold for purposes other than to effect a partition, no deviation from the codal articles occurred until 1924. In that year the Legislature, by Act 149, authorized the private sale of the property of a minor or interdict, when it was to his advantage and when made under the supervision of the court, regardless of the purpose of the sale. Two years later, by Act 77 of 1928, the language of that statute was clarified, the Legislature specifically providing for a private sale of the interest of the minor or the interdict whether it be the entire property or only a part thereof, and declaring "that nothing in this act shall be construed as repealing Act No. 248 of the General Assembly of 1920." The latter, of course, concerned a sale to effect a partition. "When the Legislature met in 1932 there existed two distinct lines of statutes on the subject of the private sale of property belonging to a minor or an interdict, the first of which dealt with a sale made to effect a partition and the second with a sale for other purposes. Evidently desiring to consolidate these two lines in one comprehensive statute, the Legislature proceeded to and did adopt Act 209."
In referring to LSA-C.C. art. 337, which prohibits a tutor from purchasing the interest of a minor, the court in the Wenk case further stated that its purpose was:
"[to prevent] those standing in a fiduciary capacity from representing themselves and their principal."
and such a sale (to a tutor) would be void
"as being in contravention of a prohibitory law."
This latter would imply that any fiduciary would be so prohibited. However, this statement as to a fiduciary was made with specific reference to the tutor, and the codal article prohibiting such a sale. However, there is no prohibition in the code as pertains to a co-owner, as above mentioned. Thus Nutter was not barred from purchasing part of their interest.
Plaintiffs next argue that although the Act authorized a private sale for any purpose, that it could be authorized only on condition that the price, terms and conditions of the sale be shown. In support of this proposition they rely on section 4 of the Act in that it requires the Court to fix the minimum price to be accepted, the cash or credit terms and security. They further argue that rendition of services and payment of court costs, employing attorneys and other acts necessary in annulling the sale do not constitute price. This sale was executory until Nutter performed his part. When he complied with the terms thereof it was executed. At that time a price was definitely set and determinable: costs of court (trial and appellate); and advance payment on attorney's fees of $2,500 was made. [At a later date Nutter conveyed, sold etc. to the attorneys royalties not to exceed $25,000, said act reciting that the transfer was in consideration of services rendered in the Johnston v. Burton suit.] By the very nature of "court costs", and attorney's fees in similar cases, they are not determinable at the moment of confection of such agreements. However, with a view to a reasonable interpretation it may be readily and candidly stated that such "court costs" are the usual ones and to be determined at the end of the litigationas to attorney's fees, those are always such as are reasonable. Thus, at the time this sale became executed the price was determined. The trial court in the Burton case ordered that defendant Burton pay coststhat judgment was affirmed on appeal; and attorney's fees in the amount of $2,500 were paid when suit was filed. Everything that was to be done by the parties, as ordered by the trial judge in the tutorship proceedings, had been performednothing more was required to be done. The attorney's fees are not attacked as being unreasonable and this court does not find that they were unreasonable under *817 the circumstances then existing. Therefore, the price was certain in that it consisted of court costs and attorney's fees; the latter having been paid when suit was filed in the amount of $2,500. The mere fact that "rendition of services and other acts necessary in annulling the sale" were part of the stated consideration do not remove the price from the realm of certainty ("certain price") nor was the stated consideration such that it could not be determined by the parties. It is a settled principle of law that "while the validity of a sale does not depend on a price being fixed with certainty in the act, it does depend on a certain price being agreed upon by the parties or left to the arbitration of a third person able and willing to fix it." See Patton's Heirs v. Moseley, 186 La. 1088, 173 So. 772 and cases cited therein. In that case a price was recited in the act, but the evidence showed that the sale was a simulation and that no cash nor its equivalent was given. Price is discussed in the case of Pulford v. Dimmick, 107 La. 403, 31 So. 879. There the defendant, claiming by virtue of a transfer, was the only one to testify as to price. The court found that his testimony was contradictory and did not show that a price was agreed upon by the parties. In the case at bar, the exact price was not recited in the act, but could readily be determined therefrom as shown hereinabove. Counsel for plaintiff has cited several other caseshowever, we do not find them applicable, but rather find that they are either distinguishable on their facts or are not germane nor do they resolve the legal issues here posed favorable to plaintiffs' position. [Those cases are Lewis v. King, 157 La. 718, 103 So. 19; Harvey v. Richard, 200 La. 97, 7 So.2d 674; Cheramie v. Stiles, 215 La. 682, 41 So.2d 502; Breland v. Humphries, La.App., 50 So.2d 69; Tracy v. Dufrene, 240 La. 232, 121 So.2d 843.]
The next question presented is that of res judicata. Plaintiffs maintain that since Nutter did not allege in the Johnston v. Burton suit that he was a co-owner by virtue of the conveyance by the tutor to him, but only alleged that he was co-owner by virtue of his acquisition from Ward Thompson, that therefore, he is barred from claiming title to the property acquired in the conveyance by the tutor and that he has judicially admitted that he had no ownership in that property. LSA-C.C. Art. 2286 states the essential elements of res judicata thusly:
"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."
The case of Hope v. Madison, 194 La. 337, 193 So. 666, 668, contains an extensive discussion of res judicata, and the jurisprudence relating thereto, as follows:
"`The law of res judicata is stated with great simplicity and precision by article 2286, Civ.Code, * * * This formula was borrowed by our Code from the Code Napoleon * * * by the Code Napoleon from Potheir, Obligations, No. 889; and by Pothier from the Roman jurisconsults. It brings out with great distinctness the salient feature of the law of res judicata, namely, the identity that must exist as to thing demanded, cause of action, and persons in the two suits. * * * "The exception of the thing adjudged is stricti juris, and, if there should be any doubt as to the identity of the things claimed, or of the persons claiming them, it cannot be maintained." * * * "The plea of res adjudicata is without force, unless the object demanded in the former suit was precisely the same as that demanded in the action pending." * * "The only test as the effect of a decree is its finality as to the matters embraced *818 in it, and its having the requisites of article 2265 (2286) of the Civil Code." * * * "The authority of res adjudicata takes place only with respect to what was the object of the judgment." * * *: Our court has never wavered, that we know of, in the rigid exaction of the three unities.'
* * * * * *
"`In order to have the authority of the thing adjudged respected, the law places at the disposal of parties affected a special exception * * * But the law ordains * * * them to state precisely in an exact manner that which has actually been judged the first time, in order to know that which may again be litigated. * *
"`To recognize in which case the exception of res judicata is applicable to a new demand, three conditions have long been established; it is necessary 1. That the second suit be between the same parties, 2. That it be brought on the same object, and 3. That it have the same cause as the first. * * *"
The petition in the Johnston v. Burton suit set forth the capacities of the parties plaintiff. There it was averred, among other things, that Nutter, one of plaintiffs therein, had acquired title from Ward Thompson, and prayed that the judicial sale (Partition by licitation at Sheriff's sale) be set aside. That trial court ordered that the judicial sale to Burton be set aside and declared that plaintiffs therein be decreed the owners. That judgment did not set forth the proportions in which they were to be declared the owners. The petition did not ask for a determination of the rights of the plaintiffs as amongst themselves. The trial court's judgment, which declared the sale to be a nullity, was affirmed by the Supreme Court without attempting to go into the respective interests of the plaintiffs. The question of ownership as between the plaintiffs was not at issue, and was not decided by the court in that decision. The case of Hope v. Madison, supra, and cases cited therein, also stands for the proposition that:
"An issue presented by the pleadings in a cause, but eliminated from the judgment of the Court, cannot be invoked in support of the plea of res adjudicata."
That judgment, in the Burton case did not purport to, nor did it attempt to consider any question of title as between those plaintiffs. It merely declared them to be the owners of property which had previously been adjudicated to W. T. Burton. The suit before us was brought to annul the conveyance by the tutor to Nutter. It is a suit to declare that the conveyance to Nutter was a nullity and to decree plaintiffs the owners of that interest. Admittedly these parties were plaintiffs (including Nutter) in the Burton suit. However, the codal provision provides that it must be "between the same parties, and formed by them against each other in the same quality." Nutter was not a defendant in the Burton case; and the suit was not brought "against each other in the same quality" within the intendment of the codal provision. The Burton suit was for the annulment of a judicial sale on the grounds of certain irregularitieshere the suit is for the annulment of a separate and distinct conveyance on different grounds, and the suit does not arise out of the same cause of action. Therefore, we are unable to find merit in the plea of res judicata as advanced by the plaintiffs herein.
In view of the above it is not necessary that we consider the defendants' pleas of estoppel, prescription and ratification.
The remaining issues pertain to oil and gas law. There is no dispute as to the facts surrounding the leases, but rather there is serious question as to the legal effect to be given to the transactions surrounding the development on the property in question.
*819 The property involved is located in St. Martin Parish, Louisiana, to wit:
East One-Half (½) of Northeast Quarter (¼);
Northwest Quarter (¼) of Northeast Quarter (¼);
Section 36, Township 14 South, Range 11 East:
Northwest Quarter (¼) of Northwest Quarter (¼);
Southeast Quarter (¼) of Southwest Quarter (¼);
Section 31, Township 14 South, Range 12 East;
Lots 2, 3, 4, and 5;
South One-Half (½) and Northwest Quarter (¼) of Northeast Quarter (¼);
Southeast Quarter (¼) of Northwest Quarter (¼);
West One-Half (½) and Northeast Quarter (¼) of Northwest Quarter (¼);
Section 2, Township 15 South, Range 11 East:
All Fractional Section 4, Township 15 South, Range 11 East.
On January 7, 1943, Robert Prestridge, Sr., as tutor to Robert Prestridge, Jr., and Marie Bess Prestridge, executed an oil, gas and mineral lease to R. H. Goodrich and W. H. Cocke covering the interests of said plaintiffs in certain property which included the property hereinabove described. The primary term of the lease was for 10 years from its date. By act dated January 11, 1943, H. E. Nutter conveyed to R. H. Goodrich and W. H. Cocke all of his undivided right, title and interest in the lands hereinabove described. On January 17, 1943, plaintiff, Allie E. Prestridge Inbau (who was emancipated by marriage) executed in favor of Cocke and Goodrich a lease similar to the one entered into for her minor brother and sister. On May 17, 1943, Goodrich and Cocke (and the heirs of G. P. Johnston) leased their interests in the same lands covered by the Prestridge and Inbau leases to defendant, Humble Oil & Refining Company for a primary term of five years. On May 17, 1943, Cocke and Goodrich transferred the leases they had obtained from Inbau and Prestridge to Humble Oil & Refining Company. Later Albert Prestridge, the major brother of plaintiffs, leased his interest to Humble, said lease containing a primary term of five years. On June 14, 1948, Humble retransferred to Cocke and Goodrich all of its interest in and to the Prestridge and Inbau leases executed in January, 1943, insofar as they covered the East 80 Acres of Section 4, Township 15 South, Range 11 East and other property not involved in this suit. On March 20, 1952, Cocke and Goodrich transferred to Humble an undivided ½ interest in the Prestridge and Inbau leases as to the East 80 acres of Section 4.
The lands located in Section 2, described above, are not contiguous to any of the lands hereinabove described in the other sections; those lands described in Section 4 are not contiguous to any of the other described sections; no drilling was commenced on any of the hereinabove described lands within the primary term of ten years of the dates of Prestridge and Inbau leases, except as to those lands in Section 2 and the East 80 acres of Section 4. Plaintiffs seek a judgment cancelling the Prestridge and Inbau leases executed in January, 1943, insofar as they cover the above described lands, except as to the lands located in Section 2, Township 15 South, Range 11 East, they seek cancellation thereof only insofar as they cover the undivided 3/32nds (owned by Cocke and Goodrich) interest involved in this suit. The theory relied on by plaintiffs is that as to the lands located in Section 36, Section 31, and Section 4, less the East 80 acres of Section 4, that the leases are subject to prescription of ten years liberandi causa and as regards the East 80 acres of Section 4, the 1943 transfer by Cocke and Goodrich to Humble constituted an assignment and not a sub-lease and consequently these *820 leases lapsed as delay rentals were not paid nor were the leases kept alive by production from Section 2.
The trial court disposed of plaintiffs' contentions briefly and concisely in the following manner:
"The Supreme Court of this State having recently decided that neither Article 3529 of the Civil Code, pertaining to the prescription of real rights, nor Article 3546, which provides that rights of usufruct, use and habitation, and servitudes are lost by ten years non-use, are applicable to mineral leases. (See Reagan v. Murphy, [235 La. 529] 105 So.2d [210] 218) the only question remaining for decision is whether the defendants, Humble Oil & Refining Company and Cocke and Goodrich, have in effect divided each the Prestridge and Inbau leases into more than one lease. The documents in this connection and the pertinent parts thereof have been referred to hereinabove. Suffice it to say that in accordance with the well established jurisprudence, all of the transfers by Cocke and Goodrich to Humble Oil & Refining Company were subleases and not assignments and did not therefore operate to divide these leases and certainly the retransfer by Humble Oil & Refining Company to Cocke and Goodrich did not have that effect. (See Smith, et al. v. Sun Oil Company, Inc., 165 La. 907, 116 So. 379; Roberson et al. v. Pioneer Gas Company, 173 La. 313, 137 So. 46 [82 A.L.R. 1264]; Tomlinson v. Thurmon, 189 La. 959, 181 So. 458; Stacy et al. v. Midstates Oil Corporation, et al., 214 La. 173, 36 So.2d 714; Bond v. Midstates Oil Corporation et al., 219 La. 415, 53 So.2d 149; Mier [Wier] v. Glassell, 216 La. 828, 44 So.2d 882; Broussard, et al. v. Hassie Hunt Trust, 231 La. [474] 477, 91 So.2d [762] 782.)
We feel that the trial court properly applied the law as found in our jurisprudence.
In the case of Reagan v. Murphy (cited in quoted part of district court opinion supra) the Supreme Court disposed of similar contentions as in the case at bar. It specifically held that:
"Since we are of the opinion that R.S. 9:1105 did not have the effect of changing the true nature of real rights as defined and understood under the civil law, it follows that Article 3529 of the Civil Code, pertaining to the prescription of real rights and Article 3546, providing that the rights of usufruct, use and habitation, and servitudes are lost by ten years nonuse, are inapplicable to the cases." [235 La. 529, 105 So.2d 215].
The court, in the Reagan case, stated that the case of Arent v. Hunter, 171 La. 1059, 133 So. 157, applied the rule of certain cases to the effect that (105 So.2d at page 212 of the Reagan case):
"a mineral servitude established on non-contiguous tracts created separate servitudes on each tract, sustained plaintiff's plea of prescription as to four of the five tracts involved, defendants' rights to the other tract having been preserved by user and production. In so concluding, the Court treated the mineral servitudes and the lease as one and the same as to their legal effect and, hence, the holding therein fully supports the position of the plaintiffs in these cases.
"Arent v. Hunter was decided in 1931, during the period in which the mineral law * * * was still in its formative stage. At that time the members of the Court, while being in agreement that a sale of minerals constituted the creation of a real right in the nature of a servitude (citations omitted) had not yet reached any definite conclusion as to the true nature of a mineral lease and, consequently, expressions can be found in the jurisprudence in which a mineral lease is regarded as a sale or considered, as in *821 Arent v. Hunter, to be in the same category as a mineral servitude.1 [Footnote 1 stated that "This is illustrated by the view of the late Chief Justice Charles A. O'Niell, who concurred in the result of Arent v. Hunter but said that he did not `* * * approve of calling a lease a servitude'."]
"It was not until 1936, in its decision in Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846, that the Court swept away the confusion evoked by the earlier cases respecting the genuine character of a mineral lease. It was held there that a mineral lease did not create a real right in favor of the lessee; that the contract produced merely personal rights and obligations between the parties, the lessee being limited to a personal action against his lessor for delivery of possession and could not maintain a petitory action against a third person. This pronouncement was not well received by the oil industry and, through its efforts, the Legislature, at its regular session of 1938, enacted Act 205 which classified oil and gas leases as real rights and provided that they may be asserted, protected and defended in the same manner as may be the ownership or possession of other immovable property without the concurrence of the landowner in any action or by any procedure available to the owner of land.
"* * * On the first occasion in which its constitutionality was assailed, Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336, the court held that the 1938 Act was intended to grant mineral lessees the advantage of maintaining real actions in protection of their interests and was merely procedural in character. * * * See also Allison v. Maroun, 193 La. 286, 190 So. 408 and Amerada Petroleum Corporation v. Reese, 195 La. 359, 196 So. 558.
"Thus it is clear, at this point of the discussion, that the Glassell decision and the cases above referred to construing Act 205 of 1938, which hold that a mineral lease is like any other predial lease and creates merely a personal right, are in direct conflict with Arent v. Hunter. Hence, although the latter has never been specifically overruled in terms, its doctrine has been rejected necessarily by implication.

* * * * * *
"In Arnold v. Sun Oil Co., 218 La. 50, 48 So.2d 369, 390, * * * the Court, citing the rulings in the Allison, Tyson and Amerada Petroleum [Amerada Petroleum Corp. v. Reese, 195 La. 359, 196 So. 558] cases and also Coyle v. North American Oil Consolidated, 201 La. 99, 9 So.2d 473, rejected the contention and reiterated that Act 205 of 1938 is `remedial and procedural in character, and that it has not affected or changed any of the substantive rights flowing from the execution of mineral leases.'
"Immediately after the Arnold case became final, the oil fraternity sought to obtain for mineral lessees by legislative enactment the special consideration denied them in that decision and was successful in having the 1938 statute amended * * *.
"It has been contended by counsel for appellee, and particularly by amicus curiae, who is alligned with appellees, that this amendatory provision, that the law classifying mineral leases as real rights is to be considered as substantive as well as procedural, has the effect of changing the essence of the mineral lease contract.
"This proposition cannot be sustained as there is nothing contained in the amendatory section to indicate such an aim. It is to be noted, imprimis, that the original law does not say that mineral leases are real rights. It declares, in substance, that they are to be classified as real rights and `may be asserted, protected, and defended in the *822 same manner' as may be the ownership or possession of other immovable property. * * *
"Indeed, it is perfectly evident from even a casual reading of the amendment that the Legislature did not intend to change the essence of the contractual rights and obligations between mineral lessees and lessors but only that it sought to place mineral lessees on the same level as landowners * * *
"In Perkins v. Long-Bell Petroleum Co. [227 La. 1044, 81 So.2d 389, 393], we said:
"A mineral lease, though characterized as a real right * * * is, as stated in the last cited case * * * `merely a contract which permits the lessee to explore for minerals on the land of the lessor in consideration of the payment of a rental and/or bonuses.' To this, we may add that the lessee is not only accorded the right to explore but is obliged to do so in most cases or pay a delay rental if he does not explore within the primary term * * *. In a mineral lease, the lessor, being entitled to royalties in the event of production, is interested in requiring his lessee to explore. Not so with a landowner whose property is subjected to a mineral servitude. Being without interest in the minerals, he is without right, during the existence of the servitude, to insist upon development, and the only duty required of him is to permit the servitude owner to explore as long as the servitude remains in esse. The grant of the servitude `* * * does not oblige the owner of the estate subject to it to do anything * * *', * * *
"Moreover, the plaintiffs in this case have an available adequate remedy by which defendants may be required to either develop the properties or release them from the effect of the * * * lease. It is the established jurisprudence that full development of the property on which a mineral lease is given is implicit in the lease contract, it being an implied condition of every lease that the lessee will test every part of the land subject to it with reasonable diligence or suffer a partial cancellation." (Emphasis supplied and citations omitted by writer of this opinion.)
For further discussion of the procedural import of Act 205 of 1938, see editorial comment following LSA-R.S. 9:1105. Porterie, District Judge, in the case of Colgin v. Harris, D.C., 27 F.Supp. 798, 799, stated that:
"It was peculiarly within the province of the writer of this opinion, for he was Attorney General of Louisiana during the 1938 session, * * * to know that Act No. 205 of 1938 has as its legislative purpose to give relief from the ruling in the then very recent case of Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846.
"In that case a lessee of an oil and gas lease filed a petitory action against the defendants who had brought in a well on certain property, alleging that they were trespassers on the land, and claiming the exclusive right to the possession of the land for the purpose of extracting the minerals therefrom. Exceptions of no right of action and no cause of action were filed by the defendants on the grounds that the plaintiff, having alleged that he was a lessee, did not have the right to institute a petitory action, particularly where the lessor had not joined in it. The exception was maintained in the court below, and on appeal the Supreme Court affirmed the decision.
"A recent review entitled `The Louisiana Legislation of 1938', * * * when treating of Act No. 205 of 1938, concludes as follows: `By defining a mineral lease as a `real right', the 1938 Act brings the right of the lessee (such as in the Glassell case) within the operation *823 of the articles of the Code of Practice permitting petitory actions. The act will place at rest the decision which, although entirely correct from a legal standpoint, was regarded as undesirable.'" (Emphasis added.)
We are in full accord with the above expressions. For more recent expressions see Tinsley v. Seismic Explorations, Inc., 239 La. 23, 117 So.2d 897 and Hodges v. Long-Bell Petroleum Company, 240 La. 198, 121 So.2d 831 and cases cited therein.
Plaintiffs claim that to follow the Reagan decision rather than the Arent decision would deny them certain constitutional rights. We find no merit in that contention. The Glassell case at least impliedly overruled the Arent case, see Reagan v. Murphy. Hence the doctrine of the Arent case was not in effect when these leases were entered into. Plaintiffs base their claim of constitutionality on the proposition that prescription had run under the doctrine of the Arent case and that therefore, they had acquired a vested property right which cannot be divested by the State. The fact of the matter is that prescription did not run as to this lease, Reagan v. Murphy, supra; the lease obligation is indivisible in its very nature, Hunter Co., Inc. v. Shell Oil Co., 211 La. 893, 31 So.2d 10; and consequently drilling on any part of the lease continued the lease in effect as to all of the lands included within the leased premises. Furthermore, Clause 6 of both the Prestridge and Inbau leases provides that in the event of production on the land or in the event of production from lands pooled therewith, that the rights granted by the lease may be maintained beyond the primary term, without the payment of rentals, for so long as the mineral so discovered is being produced in paying quantities, or operations are being carried on with due diligence. (See A. Veeder Co. v. Pan American Production Co., 205 La. 599, 17 So.2d 891 and Veeder v. Pan American Production Co., 205 La. 841, 18 So.2d 314, and cases cited therein.) Therefore, the whole lease was continued beyond its primary term by drilling on or from any part thereof, which was done. Nevertheless, the Arent case was not in effect prior to the confection of the leases in question. Therefore, no right vested in plaintiffs by virtue of the claimed prescription.
Plaintiffs next contend that the conveyance by Cocke and Goodrich to Humble, and the conveyances by Humble to Cocke and Goodrich were assignments and not subleases. Therefore, they maintain, that since assignments divide the obligation of the lessee, the lessees (defendants Cocke and Goodrich) have virtually divided the lease. In such case, and since there was no production on the remainder of the leased lands then the lease would fail as to that part so divided.
Thus the question resolves itself into a determination of whether or not the transfers were assignments or subleases.
The formula to be applied in determining whether or not it is a sublease or an assignment was clearly enunciated in Smith v. Sun Oil Co., 165 La. 907, 116 So. 379, 380. There the land owner leased to defendant, Sun Oil Co., who in turn "grant[ed], convey[ed], transfer[red] and assign[ed]" to Elliott. The court held that these words of themselves did not give it the character of an assignment, because there were conditions and stipulations in the transfer that made it a sublease. That court further stated that:
"Every sublease is, in a sense, an assignment, but every assignment of a lease is not a sublease.
"The conditions of and in the contract between the Sun Company and Elliott which made it a sublease, and not merely an assignment, were that the Sun Company did not dispose of all of its rights and obligations under the original lease on the 20 acres of land, but granted to Elliott an interest less than its own, and imposed upon him obligations under penalty of reversion *824 to the Sun Company, in addition to the obligations which Elliott assumed in favor of the original lessor." (Emphasis added. See authorities cited therein.)
In Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 48, 82 A.L.R. 1264, it was stated thusly:
"The distinction between an assignment of a lease and a sublease is that, in an assignment, the assignor transfers his entire interest in the lease in so far as it affects the property on which the lease is assigned; whereas, in a sublease, the original lessee, or sublessor, retains an interest in the lease in so far as it affects the property subleasedby imposing some obligation upon the sublessee in favor of the sublessor, such as an obligation to pay additional rent to the sublessor." (Citations omitted. See cases cited therein and also Tomlinson v. Thurmon, 189 La. 959, 181 So. 458.)
Stacy v. Midstates Oil Corporation, 214 La. 173, 36 So.2d 714, 716, followed the above rule and stated that the reason for it was that:
"The reason for that distinction is that, in the case of a sublease of a part of the leased land, the original lessee does not rid himself of all interest in and authority over the land subleased; whereas, if there is no such reservation on the part of the original lessee, his assignee acquires complete control over that part of the lease which is assigned." (Citations omitted.)
See also Wier v. Glassell, 216 La. 828, 44 So.2d 882, which merely reiterates the foregoing doctrine. Other cases have been cited, however it would serve no useful purpose to discuss them.
The first transfer, dated May 17, 1943, to Humble transferred the Prestridge and Inbau leases; the second transfer was a retransfer by Humble to Cocke and Goodrich, dated June 15, 1948, of the Prestridge and Inbau leases only insofar as the East 80 acres of Section 4, Township 15 South, Range 11 East (and other lands which are not involved here) was covered thereby; the last transfer, dated March 20, 1952, was by Cocke and Goodrich to Humble of the aforesaid East 80 acres of Section 4.
We are of the opinion that the 1943 transfer was a sublease. The last paragraph of said transfer provided that "Assignors (Cocke and Goodrich) do hereby * * * transfer and assign unto Assignee (Humble) all right, title, and interest * * * held by Assignors by virtue of the two leases * * * subject only to conditions hereinabove set out, * * *". Those conditions were:
1. As to certain leases that Humble owned as lessee, and in which Cocke and Goodrich were co-lessors with others, if Humble desired to discontinue said leases then on written request of Assignors Humble or its successors would re-transfer the released land to Assignors.
2. Assignors could request of Assignee, within certain times prior to rental pay dates, that they either pay the rent to the lessors or require that Humble re-transfer the lease to Assignorsif Humble did not desire to pay rentals as to part of the land, then they were required to re-transfer to Assignors that part.
3. In case Humble re-transferred to Assignors then Humble was to warrant the title to the land so transferred and the title was to be as complete as that originally transferred by Assignors to Assignee.
4. If Assignee paid rentals under the leases assigned then Assignee was obligated to pay the same amount of rental to Assignor.
In view of the above conditions, it is self-evident that Cocke and Goodrich retained an interest in the leased lands (i. e. leases) *825 so transferred. We do not find that the cases cited require that an over-riding royalty be retained in order that it be a sublease, but rather find that retention of control (or an interest) suffices as evidenced by the wording of the transfer in question. Therefore, it was a sublease.
We are also of the opinion that the transfer of 1948 was not an assignment. This transfer was nothing more than a compliance with the re-transfer provisions of the sublease of 1943. The rights in this land had merely reverted to Cocke and Goodrich per the very terms of the original transfer agreement.
Thus the transfers as to the East 80 acres of Section 4 were not assignments, but subleases. Therefore, they did not operate so as to divide the lease obligations.
For the foregoing reasons the judgment appealed from is affirmed at appellants' costs.
Affirmed.

On Rehearing.
Before TATE, FRUGE, SAVOY, HOOD and CULPEPPER, JJ.
CULPEPPER, Judge.
After further consideration of this case on rehearing, we have concluded that it is unnecessary for us to decide whether the contract entered into in January of 1940 between H. E. Nutter and Robert B. Prestridge, Sr. as natural tutor of the plaintiffs, was or was not a sale within the meaning of Act 209 of 1932, because even if this contract of conveyance was subject to attack, as lacking certainty of a price in money, such a defect, under the facts of the instant case, relates to form and is a relative nullity cured by the prescription of five years under LSA-Civil Code, Article 3542, which reads as follows:
"Art. 3542. The following actions are prescribed by five years: That for the nullity or rescission of contracts, testaments or other acts.
"That for the reduction of excessive donations.
"That for the rescission of partitions and guarantee of the portions.
"This prescription only commences against minors after their majority."
The plaintiffs allowed considerably more than five years to elapse after they had reached majority before attacking the contract in question. The only serious issue as to the applicability of Article 3542 is whether the contract was absolutely or only relatively null. In the case of Whitney National Bank of New Orleans v. Schwob, 203 La. 175, 13 So.2d 782, 783, a minor, prior to his coming of age, executed a deed conveying his interest in realty but allowed five years to expire after reaching his majority before instituting an annulment proceedings and the court stated the difference between absolute and relative nullities as follows:
"(1) This court has differentiated between absolute nullities in derogation of public order and good morals and those which are established in the interest of individuals. The latter nullities are susceptible of ratification, either expressly or impliedly, and may be prescribed against, while the former are never susceptible of ratification and can never be prescribed against. Vaughan v. Christine, 3 La.Ann. 328; Ackerman v. Larner, 116 La. 101, 40 So. 581; Doucet v. Fenelon, 120 La. 18, 44 So. 908; Barnes v. Barnes, 155 La. 981, 99 So. 719; and Succession of Henderson, 195 La. 665, 197 So. 267."
Plaintiffs contend that Whitney National Bank of New Orleans v. Schwob, supra, is distinguishable from the instant case because there the minor was a party to the deed which he personally signed, but in the instant case, the minor's property was *826 conveyed by a tutor. In our opinion this factual distinction does not render inapplicable the law of the Whitney Bank case as is shown by the court's citation with approval of Vaughan v. Christine, 3 La.Ann. 328, and Doucet v. Fenelon, 120 La. 18, 44 So. 908, 917, both of which cases involved instruments executed by a representative of the minor, rather than by the minor himself. In Doucet v. Fenelon, the court quoted from Vaughan v. Christine, 3 La.Ann. 328 as follows:
"If the contract is tainted with a nullity resting on motives of public order, or having its origin in the respect due to good morals, if it be prohibited by article 11 of the Code, it is an absolute nullity, to which the law perpetually resists. It is not susceptible of ratification; and the prescription of five years is inapplicable to it. * * * The other class of absolute nullities is those established for the interest of individuals, and in relation to those the rule, in onerous contracts, is, without exception, that the party in whose favor they are established may render valid the acts in which they are found by his ratification, express or implied. Toullier cites, as one of the absolute nullities of this class, the very case relied on by intervenor's counselthe sale of the immovables of the minor by his tutor. That sale, he says, is absolutely null, and yet the minor, after he becomes of age, may ratify it, not only expressly, but tacitly. * * * In all executed contracts, which, under this view of the law, may be tacitly ratified, a presumption juris et de jure of ratification results from silence and inaction during the time fixed for prescription."
See also Soule v. West, 185 La. 655, 170 So. 26 where a family meeting did not fix the terms of a sale made on behalf of the minors, and furthermore authorized the under-tutor to sign the deed, but the court held these complaints barred by the prescription of five years under LSA-Civil Code, Article 3542. See also 21 Tulane Law Review 438 for a general discussion of the principles involved.
In the more recent case of Fried v. Bradley, 219 La. 59, 52 So.2d 247, 252, the executors of an estate, who had qualified as such in the State of Mississippi, but who had not qualified as executors in Louisiana nor followed any of the other formalities required by the laws of this State in the sale of succession property, sold a tract of land in Louisiana. In discussing the prescription of five years under Art. 3542 and the prescription of ten years under Art. 2221 the court held as follows:
"Under the jurisprudence of this State the applicability of these two articles has been restricted to those nullities that are not in derogation of public order and good morals. In considering them this Court has differentiated between nullities of that type and those established in the interest of individuals and has narrowed the applicability of the articles to the latter class of nullities. See Vaughan v. Christine, 3 La.Ann. 328; Ackerman v. Larner, 116 La. 101, 40 So. 581; Doucet v. Fenelon, 120 La. 18, 44 So. 908; Barnes v. Barnes, 155 La. 981, 99 So. 719; Succession of Henderson, 195 La. 665, 197 So. 267; Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627; and Whitney National Bank of New Orleans v. Schwob, 203 La. 175, 13 So. 2d 782."
After quoting from Whitney National Bank of New Orleans v. Schwob, supra, the Supreme Court in the Fried case continued as follows:
"The reason is that the law of itself continually resists the act which is contrary to public order or good morals; consequently, the ratification would itself be tainted with the vices reprobated in the act sought to be ratified. The plaintiffs are not contending here, nor have they pointed to any law of this state that would stamp the deed involved *827 as being in derogation of public order or good morals; their contention is simply that the deed was void ab initio, and therefore is not susceptible of ratification."
In the instant case, we have no difficulty in concluding under the above authorities that the prescription of five years set forth in Article 3542 is applicable. We are dealing here with a contract, which is one of the types of instruments specifically listed in Article 3542. Plaintiffs have not cited any law of this state that would stamp the contract here as being in derogation of public order or good morals. The only alleged irregularity in the contract which we consider serious enough to discuss, but which we do not actually find it necessary to hold is an irregularity, is that the contract was not a sale within the meaning of Act 209 of 1932 because the consideration received by the minors was not a certain price in money. However, the minors unquestionably received a very valuable consideration. It is not disputed that pursuant to this contract Mr. Nutter, or his assigns, employed capable attorneys, and paid all of the attorneys fees and costs incident to the seriously contested litigation resulting in establishment of good title to the minors' interest in this property. The minors profited considerably from subsequent production of oil from the property. Now, years later, they have discovered an alleged technicality in the transaction, of which they seek to take advantage through the aid of the courts. The law does not favor such claims. See Fried v. Bradley, supra, 52 So.2d at page 255 citing Lafitte, Dufilho and Company v. Godchaux, 35 La. Ann. 1161.
The cases cited by plaintiffs, which we deem it necessary to mention, are Rocques' Heirs v. Levecque's Heirs, 110 La. 306, 34 So. 454; Breland v. Humphries, La. App., 57 So.2d 69 and Gary v. Landry, 122 La. 29, 47 So. 124, where the court found sales of minors' properties absolutely null and not subject to prescription because in all of these cases the minors actually received no consideration whatever. In those cases the court concluded that such contracts were contrary to public order and good morals and actually non-existent because the essential element of cause or consideration was missing. Such contracts cannot be confirmed or ratified, are absolutely null, and not cured by the prescription of five years.
Counsel for plaintiffs also argue that LSA-Civil Code, Article 3542 is not applicable here because the instrument in question is a "judicial transfer" made pursuant to an order of court and is not a conventional alienation. Plaintiffs cite Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582 which involved an auction sale for purposes of partition by licitation, but the price bid at auction was never paid. The court held Article 3542 inapplicable for two reasons, first that this was a public sale as distinguished from a private sale, and second that the sale was an absolute nullity by reason of the failure to pay the consideration. Plaintiff also cites Martin v. Carroll, La. App. 2 Cir., 1952, 59 So.2d 158 where the property of minors was sold at public auction for purpose of partition and the court held Article 3542 inapplicable for the reason that this sale did not constitute a contract or agreement.
This argument is without merit. Although the conveyance in question was made pursuant to order of court, it was a private and not a public sale. Our original opinion herein discusses the origin and purpose of Act 209 of 1932 which provided a procedure for the "private sale" of a minor's property. Such a conveyance is a private contract and not a sale at public auction made by a sheriff, a licensed auctioneer or other persons authorized by order of the courts of this state to sell at public auction within the meaning of LSA-Civil Code, Article 3543 which provides for two and five years prescription as to informalities *828 in auction sales. Clearly, Article 3542, and not Article 3543, is applicable here.
For the reasons assigned, the judgment appealed from is affirmed. All costs of this appeal are assessed against the plaintiffs.
Affirmed.